JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

FOR OUR RIGHTS, THOR ALVAREZ, GREG BENTLEY, STEVEN FORMAN, JOHN HEIDEMAN, LEVANA LOMMA, BRIAN MOUER-TOZIER, MADHAVA SHAKTI, GERALYN SCHULKIND, DOES 1-100

**(b)** County of Residence of First Listed Plaintiff    Kauai
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sierra Hägg Esq.
21 Waianuenue Ave, Ste # 3
Hilo, Hawaii 96720  Tel. 808-969-3600

## DEFENDANTS

DAVID Y. IGE, Governor, State of Hawaii
DEREK S.K. KAWAKAMI, Mayor, County of Kauai

County of Residence of First Listed Defendant    Honolulu
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

◻ 1  U.S. Government
    Plaintiff

☒ 3  Federal Question
    *(U.S. Government Not a Party)*

◻ 2  U.S. Government
    Defendant

◻ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ◻ 1 | ◻ 1 | Incorporated *or* Principal Place of Business In This State | ◻ 4 | ◻ 4 |
| Citizen of Another State | ◻ 2 | ◻ 2 | Incorporated *and* Principal Place of Business In Another State | ◻ 5 | ◻ 5 |
| Citizen or Subject of a Foreign Country | ◻ 3 | ◻ 3 | Foreign Nation | ◻ 6 | ◻ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ◻ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ◻ 625 Drug Related Seizure of Property 21 USC 881 | ◻ 422 Appeal 28 USC 158 | ◻ 375 False Claims Act |
| ◻ 120 Marine | ◻ 310 Airplane | ◻ 365 Personal Injury - | ◻ 690 Other | ◻ 423 Withdrawal 28 USC 157 | ◻ 400 State Reapportionment |
| ◻ 130 Miller Act | ◻ 315 Airplane Product | Product Liability | | | ◻ 410 Antitrust |
| ◻ 140 Negotiable Instrument | Liability | ◻ 367 Health Care/ | | | ◻ 430 Banks and Banking |
| ◻ 150 Recovery of Overpayment | ◻ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ◻ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ◻ 820 Copyrights | ◻ 460 Deportation |
| ◻ 151 Medicare Act | ◻ 330 Federal Employers' | Product Liability | | ◻ 830 Patent | ◻ 470 Racketeer Influenced and |
| ◻ 152 Recovery of Defaulted | Liability | ◻ 368 Asbestos Personal | | ◻ 840 Trademark | Corrupt Organizations |
| Student Loans | ◻ 340 Marine | Injury Product | | | ◻ 480 Consumer Credit |
| (Excludes Veterans) | ◻ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ◻ 490 Cable/Sat TV |
| ◻ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ◻ 710 Fair Labor Standards | ◻ 861 HIA (1395ff) | ◻ 850 Securities/Commodities/ |
| of Veteran's Benefits | ◻ 350 Motor Vehicle | ◻ 370 Other Fraud | Act | ◻ 862 Black Lung (923) | Exchange |
| ◻ 160 Stockholders' Suits | ◻ 355 Motor Vehicle | ◻ 371 Truth in Lending | ◻ 720 Labor/Management | ◻ 863 DIWC/DIWW (405(g)) | ◻ 890 Other Statutory Actions |
| ◻ 190 Other Contract | Product Liability | ◻ 380 Other Personal | Relations | ◻ 864 SSID Title XVI | ◻ 891 Agricultural Acts |
| ◻ 195 Contract Product Liability | ◻ 360 Other Personal | Property Damage | ◻ 740 Railway Labor Act | ◻ 865 RSI (405(g)) | ◻ 893 Environmental Matters |
| ◻ 196 Franchise | Injury | ◻ 385 Property Damage | ◻ 751 Family and Medical | | ◻ 895 Freedom of Information |
| | ◻ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ◻ 790 Other Labor Litigation | | ◻ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ◻ 791 Employee Retirement | **FEDERAL TAX SUITS** | ◻ 899 Administrative Procedure |
| ◻ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ◻ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ◻ 220 Foreclosure | ◻ 441 Voting | ◻ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ◻ 230 Rent Lease & Ejectment | ◻ 442 Employment | ◻ 510 Motions to Vacate | | ◻ 871 IRS—Third Party | ◻ 950 Constitutionality of |
| ◻ 240 Torts to Land | ◻ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ◻ 245 Tort Product Liability | Accommodations | ◻ 530 General | | | |
| ◻ 290 All Other Real Property | ◻ 445 Amer. w/Disabilities - | ◻ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ◻ 462 Naturalization Application | | |
| | ◻ 446 Amer. w/Disabilities - | ◻ 540 Mandamus & Other | ◻ 465 Other Immigration | | |
| | Other | ◻ 550 Civil Rights | Actions | | |
| | ◻ 448 Education | ◻ 555 Prison Condition | | | |
| | | ◻ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
    Proceeding

◻ 2  Removed from
    State Court

◻ 3  Remanded from
    Appellate Court

◻ 4  Reinstated or
    Reopened

◻ 5  Transferred from
    Another District
    *(specify)*

◻ 6  Multidistrict
    Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S. Const Amend I, IV, XIV
Brief description of cause:
The defendants are acting under the color of law to deprive the plaintiffs of their fundamental rights and liberties

## VII. REQUESTED IN COMPLAINT:

◻ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
To be Proved at trial

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ◻ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE                    DOCKET NUMBER

DATE  12/9/21    SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

Sierra Hägg, Esq. #11419
21 Waianuenue Ave. Suite 3
Hilo HI 96781
Tel. 808-969-3600


Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| FOR OUR RIGHTS, | Civil No. |
| | (Other Civil Rights) |
| | |
| a Hawaii nonprofit corporation, | COMPLAINT FOR MONEY |
| THOR ALVAREZ, | DAMAGES, DECLARATORY |
| GREG BENTLEY | RELIEF, AND INJUNCTIVE |
| STEVEN FORMAN, | RELIEF; DEMAND FOR JURY |
| JOHN HEIDEMAN, | TRIAL; SUMMONS |
| LEVANA LOMMA, | |
| BRIAN MOUER-TOZIER, | |
| MADHAVA SHAKTI, | |
| GERALYN SCHULKIND, | |
| DOES 1 through 100, | |
| on behalf of them and all other | |
| similarly situated people, | |
| Plaintiffs, | |
| | |
| vs. | |
| | |
| DAVID Y. IGE, in his official capacity | |
| as Governor of the State of Hawai'i | |
| and personal capacities, DEREK S.K. | |
| KAWAKAMI, in his official capacity | |
| as Mayor of Kaua'i and personal | |

capacities, and COUNTY OF KAUA'I,
DOES 1-100,

                Defendants.

Judge: Honorable Presiding

# TABLE OF CONTENTS

## I. INTRODUCTION

## II. SUMMARY OF THE CASE

## III. STANDING, VENUE, JURISDICTION

## IV. PARTIES

## V. STATEMENT OF FACTS

    **A.**    **Chronology**

    **B.**    **There is No Emergency – The Threat Is Manageable and Less Than Originally Expected**

        (1) Reported COVID-19 Deaths Fall Far Below the Deaths Projected a Year Ago

        (2)   COVID-19 Does Not Threaten the Entire Population - Fatalities Are Limited to a Definable Age Demographic

        (3)    COVID-19 Kills Fewer People than Other Causes of Death, for Which No Emergency Has Been or Will Be Declared

      (4)   COVID-19 Has Not Overwhelmed Healthcare Capacity

(5)   Multiple COVID-19 Vaccines are Now Deployed

(6)    The Population Has Reached or Is Fast Approaching Herd Immunity

C.  There is No Emergency - the COVID-19 "Death" and "Case" Counts are Inflated

(1) New NVSS Coding Instructions Unique to the Death Certificates of Individuals Testing Positive for COVID-19 Result in the Over-Reporting of Deaths Caused by COVID-19

(2) The PCR Test for COVID-19 is Seriously Flawed and Results in False Positive Results at High Cycles

(3) Hawai'i Department of Health (hereinafter DOH) "Case" Count is Inflated by Inclusion of "Probable Cases"

(4) The "Case" Count is Subject to Perverse Financial Incentives

D.    The Defendants' COVID-19 Mandates Are Ineffectual, and Unsupported by Science or Medicine

(1)    The Fallacy of Asymptomatic Spread

(2)    The Futility of Masking

(3)    The Futility of Lockdowns

E.    The Defendants' COVID-19 Mandates Have Wrought More Harm than COVID-19 Itself Has Caused

(1)  The Economic Crisis Caused by the Emergency Mandates

(2) The Human Catastrophe Caused by the Emergency Mandates

VI.  COUNTS

Count 1:    Declaratory Judgment – Cessation of Emergency

Count 2:    Declaratory Judgement- Constitutional Right to Free
Exercise of Religion

Count 3:    Declaratory Judgement- Constitutional Right to
Political Speech and Peaceable Assembly

Count 4:    Declaratory Judgement - False Arrest and Imprisonment

Count 5:    Declaratory Judgment – Substantive Due Process- the Right
to Interstate Travel and Intrastate Travel

Count 6:    Civil Money Damages Pursuant to 42 U.S.C. § 1983

## VII.  PRAYER FOR RELIEF

## VIII.  JURY DEMAND

# I

## INTRODUCTION

1. The above-named Plaintiffs, by and through their attorneys, and for their Complaint against the above-named Defendants, in their official capacities, allege and aver as follows:

2. This case is a federal civil rights action, brought pursuant to 42 U.S.C. § 1983 for the deprivation of plaintiffs' constitutional rights to due process and equal protection under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. The defendants are acting under the color of law, by regulation, custom or usage, to deprive the plaintiffs of their fundamental rights without just cause. The statement of claim for relief is that the Hawai'i Governor's Emergency Proclamation Related to the Covid-19 Response dated March 4, 2020 and

succeeding Emergency Proclamations violate the plaintiffs' fundamental rights to

the free exercise of religion, freedom of association, right to interstate travel, right

to movement, right to political speech and peaceable assembly, right to personal

autonomy and bodily integrity, right to work - liberty interest to engage in

business activity, right to intrastate travel[1] and the right to both substantive and

procedural due process and equal protection under the U.S. Constitution. The most

two recent Emergency Proclamations are dated October 1, 2021, which is the

Twenty-Third Emergency Proclamation[2] to be described more fully below and the

Twenty-Fourth Emergency Proclamation[3] dated November 29, 2021. Hereinafter,

"E.P." means all Emergency Proclamations, emergency orders, rules and

regulations issued by any Hawai'i state or county executive. Any amendments to

the Twenty-Third Emergency Proclamation by the Twenty-Fourth Emergency

Proclamation are immaterial for purposes of the counts alleged in this complaint

and as such the analysis shall be based on the Twenty-Third Emergency

Proclamation.

3. As the violations of the plaintiffs' U.S. constitutional rights are current,

ongoing, and prospective in the near term, permanent injunctive and declaratory

---

[1] The US Supreme Court has not ruled on this right and the circuit courts are spilt and our research indicates that the 9th Circuit has not decided this issue.

[2] The Twenty-Second and Twenty Third Emergency Proclamations were titled "Emergency Proclamation" whereas all preceding proclamations were titled by number except the first proclamation.

[3] This E.P. is named "Emergency Proclamation Related to Covid-19"

relief against the E.P. is warranted. Plaintiffs seek a declaration that the E.P. as

alleged herein violated the First, Fourth, and Fourteenth Amendments to the U.S.

Constitution; denied the plaintiffs procedural and substantive due process and

equal protection, and violated the Civil Rights Act of 1871, 42 U.S.C. §1983. A

declaration of such is in the public interest as the E.P. affect the public at large and

a declaration would be useful clarifying the legal relations in issue. Plaintiffs also

seek injunctive relief to require defendants to prospectively comply with federal

statutory and constitutional law.

## II

## SUMMARY OF THE CASE

> "In all tyrannical governments the supreme magistracy, or the right both of
> making and of enforcing the laws, is vested in one and the same man, or one
> and the same body of men; and wherever these two powers are united
> together, there can be no public liberty."
> — William Blackstone, Jurist


> "While some may find the limitations on the Governor's power frustrating,
> those limitations specifically exist to protect our liberty and other
> constitutional freedoms. Admittedly, the legislative process can be an
> arduous one. But that's no bug in the constitutional design: it is the very
> point of the design.' Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1151 (10th
> Cir. 2016) (Gorsuch, J., concurring). Escaping the imposition of a single
> ruler's dictates on the people impelled the founding fathers to risk their lives,
> their fortunes, and their sacred honor in 1776." See Fabick v. Evers, 2021
> WI 28 (2021) (Rebecca Grassl Bradley, J., concurring) (citing the
> Declaration of Independence).

4.  Since March 4, 2020, Executive defendant Ige has declared the existence of a state of emergency under Haw. Rev. Stat. § 127A-14 (2019) having issued E.P. and also Executive defendant Kawakami has issued his own E.P. Plaintiffs allege that **defendants cannot exercise their emergency powers in violation of the U.S. constitutional rights of plaintiffs**, that **there is no justification to exercise the emergency powers** and plaintiffs request judicial review whether such justification exists and award relief for conduct found to violate a constitutional right.

5. Plaintiffs allege and contest defendant Ige's Twenty-Third E.P., which states as a premise for the justification to continue the Emergency that "the recorded number of cases and deaths has continued to increase, with more than 79,000 documented cases of COVID-19 in the State and more than 780 deaths attributed to this disease".[4]  Plaintiffs allege **the projected numbers of positive cases and deaths are false** and contend that these statistics are grossly inflated since the principle test used is the RT-PCR test which plaintiffs allege is seriously flawed and results in false positive results at high cycles, does not diagnosis any disease nor does it differentiate between COVID-19 and other influenza and cold

---

[4] On June 7, 2021, in the Twenty-**First** E.P. as a basis for the so-called Emergency, it states "the recorded number of cases and deaths has continued to increase, with more than 36,600 documented cases of COVID-19 in the State and 505 deaths attributed to this disease"

viruses, [5] and also that the purported deaths caused by COVID-19 are grossly

exaggerated and that COVID-19 is not the underlying condition of the cause in fact

of many of the deaths[6] and that the number of deaths are statistically insignificant

to the general population and deaths caused by other diseases. Plaintiffs allege that

COVID-19 is roughly as dangerous as the seasonal flu, less dangerous than many

other infectious diseases and the State of Hawaii executive officers have never

before exercised emergency powers for such a length of time (19+months) and

taken such extraordinary steps (lockdowns without due process, mask, social

distancing and emergency medical drug mandates, gathering restrictions,

restricting and burdening interstate and intrastate travel, suspension of state laws,

school closures, quarantining people who are not sick) and that defendants actions

as implemented through their E.P. is arbitrary and capricious. Therefore, plaintiffs

contest this factual basis and contend that such a basis does not justify a

declaration of emergency regardless of the hyperboles contained in the DOH press

releases and reports.

---

[5] After December 31, 2021, CDC will withdraw the request to the U.S. Food and Drug Administration (FDA) for Emergency Use Authorization (EUA) of the CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel as the "CDC encourages laboratories to consider adoption of a multiplexed method that can facilitate detection and differentiation of SARS-CoV-2 and influenza viruses."
[6] New NVSS Coding Instructions Unique to the Death Certificates of Individuals Testing Positive for COVID-19 Result in the Over-Reporting of Deaths Caused by COVID-19. There were **37 deaths** among people who reported no underlying conditions per the DOH Summary of COVID-19 data dashboard.

6. Plaintiffs contest **the E.P. stated basis as the justification to continue the Emergency that "COVID-19 continues to directly and indirectly cause fiscal and economic catastrophe** not previously experienced by the State" and allege and contend that it is not COVID-19, but defendants unlawful declaration of emergency and E.P. that are the cause of the fiscal and economic injury and COVID-19 is but a pretext by defendants to establish despotic totalitarian state control through the sacrifice of fundamental constitutional rights under the guise of "health, safety and welfare." Plaintiffs herein have been directly harmed by the actions of defendant Ige and defendant Kawakami taken under color of law.

7. Plaintiffs allege that Executive defendant Ige's Twenty-Third E.P., Article II. Act with Care. A. Safe Practices[7] and C. Force and Effect of Law[8], Article IV. Travel to the State. A. Health Screening for Travelers to State[9], B. Self-

---

[7] All persons in the State shall wear a face covering over their nose and mouth as set forth in Exhibit A, which shall be enforced by each county. All persons shall comply with applicable safety, hygiene and physical distancing guidance from the Centers for Disease Control and Prevention (CDC) as well as with State, county, industry and regulatory practices for safety, hygiene and physical distancing, including standards and requirements adopted and issued by DOH (DOH).

[8] Pursuant to section 127A-29, HRS, any person who intentionally, knowingly or recklessly engages in conduct that violates any provision set forth in Section II of this Proclamation shall be guilty of a misdemeanor, and upon conviction, the person shall be fined not more than $5,000, or imprisoned not 5 of 20 more than one year, or both, unless noncompliance is designated by a county as a lesser offense with lesser penalties as provided by section 127A-29, HRS.

[9] Pursuant to section 127A-11, HRS, all persons entering the State of Hawai'i shall submit to the mandatory screening process and complete the mandatory documentation identified in the Rules Relating to COVID-19 Screening Process and Travel Self-Quarantine, attached hereto as Exhibit B and hereinafter referred to as the "Travel Rules," and must comply with all applicable

Quarantine for Travelers to State[10], F. Force and Effect of Law[11] (a Governor edict of law), violate plaintiffs federal constitutional fundamental rights and civil liberties.

# III

## STANDING VENUE AND JURISDICTION

8. This court exercises subject matter jurisdiction under 28 U.S.C. §1331 and 1343, as this litigation involves multiple claims and issues arising under the 1st,

---

State and county rules, directives, and orders related to travelers.

[10] Pursuant to section 127A-13(a)(1), HRS, all persons entering the State of Hawai'i shall be subject to mandatory self-quarantine as provided in the Travel Rules. The period of self-quarantine shall begin from the day of entry into the State and shall last 10 days or the duration of the person's presence in the State, whichever is shorter. Persons who require paid or commercial lodging while subject to the mandatory self-quarantine shall not designate as their quarantine location a short-term rental, as defined by the applicable ordinances in each county, or as mandated by county order, rule or directive. Where a county rule, directive or order prohibits intended residents from residing in a short-term rental, as defined by the applicable county ordinances, all intended residents of that county must designate a hotel or motel as their quarantine location. The self-quarantine mandated in the Travel Rules, or any waiver or exemption therefrom, does not affect or in any way impede or supersede the authority of CDC, or DOH pursuant to sections 321-1 and 325-8, HRS, to require persons to quarantine if they test positive for COVID-19 or if they are a close contact of a person confirmed positive for COVID-19, regardless of whether a negative test result was subsequently obtained.

[11] Pursuant to section 127A-25, HRS, all provisions set forth in Section IV of this Proclamation and the Travel Rules are hereby adopted as rules and shall have the force and effect of law. Pursuant to section 127A-29, HRS, any person who intentionally, knowingly, or recklessly engages in conduct that violates Section IV of this Proclamation or the Travel Rules shall be guilty of a misdemeanor, and upon conviction, the person shall be fined not more than $5,000, or imprisoned not more than one year, or both, unless noncompliance is designated by a county as a lesser offense with lesser penalties as provided by section 127A-29, HRS.

4th, and 14th Amendments to the U.S. Constitution, and related precedent. This Court has authority to grant the requested injunctive relief under 28 U.S.C. §1343 and 42 U.S.C §1983; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; and costs and attorney's fees under 42 U.S.C. § 1988.

9. This court exercises subject matter jurisdiction under 42 U.S.C. § 1983, as this litigation involves the deprivation of rights, protections, privileges and immunities secured by the U.S. Constitution.

10. There is a "case or controversy" within the meaning of Article III of the federal Constitution since *inter alia* neither the termination of the Emergency nor the relaxation or rescission of the E.P. can moot the claims for civil money damages asserted under 42 U.S.C. § 1983.

11. As for plaintiffs' requests for injunctive relief, the defendants can unilaterally increase the severity of the previously relaxed E. P., or reinstate those that have been rescinded, at any time while the current so-called Emergency persists or is reintroduced. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000).

12. Venue lies in this court under 28 U.S.C. § 1391(b)(1)(2), since at least one defendant resides in this judicial district, and all defendants reside in Hawai'i,

and a substantial part of the actions or omissions giving rise to the claim occurred within the district.

13. Plaintiffs have standing to bring this litigation, since they can establish that (1) they have suffered some actual or threatened injury, (2) the injury can fairly be traced to the challenged actions of the defendants, and (3) the injury is likely to be redressed by a favorable decision of this court. N.H. Lottery Comm'n v. Rosen, 2021 U.S. App. LEXIS 1526 *15-17, quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Defendants have standing given they have suffered the actual injury of being told they must be confined to their house or face criminal liability and the threat remains as the state of Hawai'i still requires Plaintiffs to receive a negative Covid test prior to travel or be subject to a mandatory 10 day quarantine. This injury is the direct result of Defendant's Emergency Proclamations, and a favorable decision would allow Plaintiffs to regain their right to be free from governmental interference in their travel without facing criminal punishment. The Defendant's emergency proclamations constitute state actions which have impacted Plaintiff's US Constitutional rights to the free exercise of religion, political speech and peaceable assembly, their constitutional right to be free from false arrest and imprisonment, and have not provided constitutionally required substantive due process. Thus, this well-pled complaint properly invokes federal question jurisdiction as the matter in dispute is based on whether

Defendant's violated Constitutional liberties of Plaintiffs and this case is properly placed in Federal Court.

## IV

## PARTIES

14. **Plaintiff For Our Rights, Inc.,** a Hawaii non-profit corporation, is a civil rights organization that files lawsuits to enjoin and redress civil rights violations and on behalf of others similarly situated.

15. **Thor Alvarez** is a resident of Kapa'a, Hawai'i who works as a commercial/residential painter and was forced by defendant Ige's Third E.P. and successive "stay-at-home" order(s), into house arrest and imprisonment without due process. If he did not follow the order, he (and others similarly situated) would be subject to arrest and criminal prosecution per the executive edicts. Plaintiff Alvarez alleges that the "stay-at-home" order violated his First and Fourth Amendment rights and rights to Due Process and Equal Protection under the 14th Amendment as this order is an unreasonable seizure of the person - a false arrest, detention, and imprisonment. The order also prevented him from his right to associate with other people all without due process of law and defendants conduct caused plaintiff Alvarez to suffer compensatory damages as the "stay-at-home" order prevented him from engaging in his job to earn money and violated his rights to associate with other people and not to be imprisoned in his own home.

16. **Greg Bentley** is a resident of Princeville, Hawai'i who did not obtain a COVID-19 test prior to an interstate flight from Michigan to Hawai'i and was not sick with COVID-19, however, he was forced to self-quarantine for 14 day upon arrival in Hawai'i from Michigan, otherwise if he did not self-quarantine he (and others similarly situated) would be subject to arrest and criminal prosecution per defendant Ige E.P. while under the self-quarantine order. Plaintiff Bentley alleges that defendant Ige E.P. ordering a self-quarantine of plaintiff, is a forced house arrest and imprisonment without due process, violated his First and Fourth Amendment rights, and violated his Due Process and Equal Protection rights under the 14th Amendment as this order is an unreasonable seizure of the person - a false arrest, detention and imprisonment, is a violation of his right to freedom of movement and right to travel, prevented him from his right to associate with other people and violated his freedom of religion in that plaintiff Bentley was deprived of his ability to attend church services as a devout Christian who follows the commands of God to assemble together and the taking communion as the body of Christ and to keep the apostles doctrine which includes the laying on of hands, intimate prayer with other believers and intimate communal worship of God, and fellowship which all involves in-person participation through the power of the Holy Spirit.

17. **Steven Forman** is a resident of Paia, Hawai'i who was deprived of his right to the free exercise of his religion because defendant Ige's Third E.P. and

successive "stay-at home" orders violated his First and Fourth Amendment rights and Due Process under the 14th Amendment as this order is an unreasonable seizure of the person - a false arrest, detention and imprisonment and also prevented him from his right to freedom of religion and right to associate with other people in that the order prevented his church; the body of Christ from assembling and taking communion together and to keep the apostles doctrine which includes the laying on of hands, intimate prayer with other believers, intimate communal worship of God, and fellowship which all involves in-person participation through the power of the Holy Spirit, otherwise if he did not follow the order he would be subject to arrest and criminal prosecution per defendant Ige E.P. causing the plaintiff to suffer damages and on behalf of others similarly situated.

18. **John Heideman**, a resident of Kapolei, Hawai'i traveled by plane from Los Angeles back home to Hawai'i on May 20, 2021. He did not obtain a COVID-19 test prior to an interstate flight and was not sick with COVID-19, however, he was forced to sign an order to quarantine for 10 days without any medical evaluation and if he refused to sign the order, he would be denied entry back into Hawai'i. Upon signing the order, he would be subject to arrest and criminal prosecution if he did not confine himself to his home for 10 days.  Plaintiff Heideman contacted the Governor's Office, the Department of Health, the Department of Emergency Management, the Honolulu Mayor, and the Third

Circuit Court prior to travel stating his intent to exercise his constitutional right to travel and that he would not submit to COVID-19 testing as a prerequisite to enter Hawai'i. Plaintiff Heideman requested a hearing to contest the quarantine order, pursuant to H.R.S. 325-8(e) but was denied a hearing and so did "quarantine" for 10 days since he would be subject to arrest and criminal prosecution per defendant Ige's E.P. Plaintiff Heideman alleges that defendant Ige E.P. ordering a forced self-quarantine of plaintiff violated plaintiff's First and Fourth Amendment rights and Due Process rights under the 14th Amendment as this order is an unreasonable seizure of the person - a false arrest, detention and imprisonment and also prevented him from his right to associate with other people and is a violation of his right to travel causing plaintiff to suffer damages and on behalf of others similarly situated.

19. **Levana Lomma,** a resident of Kapa'a, Hawai'i traveled intrastate by plane from Oahu to Lihue airport on March 22, 2021. Plaintiff Lomma traveled to Oahu for the sole purpose to speak at a political freedom rally as plaintiff is the founder of the civil rights organization "For Our Rights, Inc." and plaintiff Lomma did in fact speak at the political rally about the constitutionality of defendants Emergency Proclamation and other political subjects before the public assembly. Defendant Ige Eighteenth E.P. signed on February 12, 2021, was in effect on March 22, 2021, as was also defendant Kawakami's Seventh Supplementary

Proclamation dated February 19, 2021, which continues defendant Kawakami's Emergency Proclamation dated March 4, 2020.

20. Plaintiff Lomma returned from the political rally held in Oahu on March 22, 2021 and upon her arrival at Lihue airport, plaintiff Lomma presented an affidavit to law enforcement at the Lihue airport which stated plaintiff Lomma has a right to move about freely and refuse any medical interventions, which was accepted by enforcement officers at the airport, allowing plaintiff Lomma to exit the airport and traveled to her home without verbal nor written agreement to "quarantine". Plaintiff Lomma did not sign an order to quarantine. She was later arrested by Kauai County police on March 25, 2021, and also on March 31, 2021, for "leaving [her] home." The Kauai County prosecuting attorney filed a complaint that plaintiff Lomma did "knowingly [fail] to enter and/or remain within the confines of the quarantine location designated by the person," however, plaintiff Lomma did not designate a quarantine location because she did not sign any order to quarantine. Plaintiff Lomma is being prosecuted and is subject to criminal penalties set forth in defendants E.P. notwithstanding that there is no basis for defendants to believe that plaintiff has been exposed to or has known to have been infected with a contagious disease.

21. Plaintiff Lomma alleges defendants violated her First Amendment right to freedom of movement, right to associate, freedom of movement, right to exercise and engage in political speech without retaliation, Fourth Amendment to

be free from unreasonable seizure without a warrant, Due Process and Equal

Protection Rights under the Fourteenth Amendment to intrastate travel between

islands, and that the E.P. and HRS §127A-29 violates the U.S. constitution as

these edicts and statutes are facially invalid for vagueness and overbreadth and

violate procedural due process in its application to plaintiff and violate equal

protection under the law and the above constitutional rights and liberties stated in

this paragraph. Plaintiff Lomma also alleges that a state executive cannot define

crimes and the criminal penalties where the E.P. deprive or chill fundamental

rights and liberties. See *United States v. Robel*, 389 U.S. 258, 273–74 (1967)

(Brennan, J., concurring).

22. Prior to the flight, plaintiff Lomma contacted the Governor's Office, the

Department of Health, the Department of Emergency Management, the Honolulu

Mayor, and the Third Circuit Court stating her intent to exercise her constitutional

right to travel and freedom of movement and that she would not submit to COVID-

19 testing. Plaintiff Lomma requested her right to a hearing to contest the

quarantine order pursuant to H.R.S 325-8(e) but was never given approval or

denial and on behalf of others similarly situated.

23. **Brian Mouer-Tozier** is a resident of De Soto, Missouri who obtained a

negative COVID-19 test from a CLIA certified lab prior to an interstate flight from

Missouri to Kaua'i and he was not sick with COVID-19, however, upon his arrival

at Lihue airport, he was informed that his CLIA negative COVID-19 test would

not be accepted because it was not from a "trusted partner" and he would be denied

entry into Hawai'i unless he signed a quarantine order and self-quarantined for 14

days upon arrival from Missouri to Kaua'i even without a medical evaluation.

Otherwise, if he did not self-quarantine, he would be subject to arrest and criminal

prosecution per defendants E.P. while under the self-quarantine order. Plaintiff

Mouer-Tozier alleges that defendants ordering a forced self-quarantine of plaintiff

violated his First and Fourth Amendment rights and Due Process and Equal

Protection rights under the 14th Amendment as this order is an unreasonable

seizure of the person - a false arrest, detention and imprisonment and prevented

him from his right to associate with other people.  Plaintiff Mouer-Tozier was

compelled to pay for the imposed quarantine at his own expense and a GPS

tracking bracelet was attached to his wrist and he was warned that if he traveled

outside the boundaries of the hotel property he would be arrested and prosecuted.

Plaintiff Mouer-Tozier was not permitted to speak to his family or anyone else at

the resort and on behalf of others similarly situated.

24. **Brian Ridgeway** is a resident of Los Angeles, California who obtained a

negative COVID-19 test from a CLIA certified lab prior to an interstate flight from

Los Angeles to Hawai'i and he was not sick with COVID-19. However, upon his

arrival at the airport in Hawai'i, he was told that his negative COVID-19 test was

not from a "trusted partner" and he was forced to sign an order to quarantine for 10

days without any medical evaluation. If he refused to sign the order, he would be

denied entry to Hawai'i. If he signed the order, he would be subject to arrest and criminal prosecution if he did not quarantine for 10 days. Plaintiff Ridgeway refused to sign the order for quarantine, and he was denied entry to Hawai'i being arrested, detained and/or imprisoned. Defendants placed him under police watch and restrained plaintiff's movements at the airport until he was forced to board a plane and travel back to Los Angeles and was forced to pay money for the ticket. Plaintiff alleges defendants violated his First and Fourth Amendment and Due Process and Equal Protection rights under the 14th Amendment and on behalf of others similarly situated.

25. **Madhava Shakti** is a resident of Keaau, Hawai'i who did not obtain a COVID-19 test prior to an interisland flight from the Hawai'i "Big Island" to Oahu and was not sick with COVID-19, however, she was forced to self-quarantine for 10 days even without a medical evaluation, otherwise if she did not self-quarantine she would be subject to arrest and criminal prosecution per defendants E.P. while under the self-quarantine order. Plaintiff Shakti alleges defendants violated her First and Fourth Amendment rights and Due Process and Equal Protection rights under the 14th Amendment as this order is an unreasonable seizure of the person - a false arrest, detention and imprisonment, violates her freedom to movement, right to travel, bodily integrity to be free from medical intervention (i.e., a swab being inserted into the nasal cavity to test for COVID-19), right to association and freedom of religion as plaintiff Shakti holds a sincere religious belief that she is

made in the image of God and the human body is the temple of the living God and she alleges that the swabs used in the COVID-19 tests contain Ethylene Oxide, a cancer causing substance which defies the temple of the living God when inserted into the nasal passages and on behalf of others similarly situated.

26. **Geralyn Schulkind**, a resident of Koloa, Hawai'i, traveled by plane from San Diego to Hawai'i and did not obtain a COVID-19 test prior to an interstate flight and was not sick with COVID-19, however, she was forced to sign an order to quarantine for 10 days without a medical evaluation. If she refused to sign the order, she would be denied entry to Hawai'i. Upon signing the order, she would be subject to arrest and criminal prosecution if she did not quarantine for 10 days. Plaintiff Schulkind was forced into a 10-day house arrest from March 9 to March 19, 2021. Plaintiff Schulkind alleges defendants violated her First and Fourth Amendment rights and Due Process and Equal Protection rights under the 14th Amendment as this order is an unreasonable seizure of the person - a false arrest, detention and imprisonment, violates her freedom to movement, right to travel, bodily integrity to be free from invasion by medical intervention (i.e., a swab being inserted into the nasal cavity to test for COVID-19) right to association and on behalf of others similarly situated.

27. **Plaintiffs DOES 1-100** are other individuals who have been harmed as a result of the Governor's executive orders and mandates and who may be joined to this lawsuit at a later date.

28. **Defendant David Y. Ige** (Ige) is sued in his official capacity as Governor of the State of Hawai'i and personal capacity. As Governor of the state of Hawai'i, defendant Ige has the responsibility to ensure that the agencies of the Executive Branch of the State of Hawai'i act in full compliance with the Constitution and the laws of the United States.

29. **Defendant Derek S.K. Kawakami** (Kawakami) is sued in his official capacity as Mayor of the County of Kaua'i and personal capacity. As Mayor, Kawakami has the responsibility to ensure that the agencies of the County of Kaua'i act in full compliance with the Constitution and the laws of the United States.

30. **Defendant County of Kaua'i** is a body corporate chartered by the State of Hawai'i. Defendant always was, is, and will remain located in the State of Hawai'i.

31. All defendants reside in Hawai'i and have, at all relevant times, acted under color of state law and knew of or should have known of the policies, practices, acts and conditions alleged.

32. Defendants DOES 1-100 are other State Officials, Federal Officials, bodies corporate and/or Hawai'i Residents who may be joined to this Lawsuit at a later date.

## V. STATEMENT OF FACTS[12]

### A.    Chronology

**2003**

CDC publishes Medical Examiners' and Coroners' Handbook on Death Registrations[13] and Fetal Death Reporting and Physicians' Handbook on Medical Certification of Death.  Publications set nationwide standard for collections and reporting of "cause of death" information on death certificates.

**2020**

01/21:  Publication of the Corman-Drosten paper detection of 2019 Novel Coronavirus 2019-nCoV by real time RT-PCR in which researchers claim to have validated the use of PCR testing for SARS-Co-V-2 virus.
 1/21:  CDC confirms first known case of COVID-19 in US.
 2/11:  WHO reports on its website, **most people infected with the COVID-19 virus will experience mild to moderate respiratory illness** without requiring special treatment.  Older people and those with underlying medical problems like cardiovascular disease, diabetes, chronic respiratory disease and cancer are more likely to develop serious illnesses.
 2/27:  US Surgeon General Doctor Jerome Adams states: "Seriously, people, STOP BUYING MASKS!  They are NOT effective in preventing general public from catching # Coronavirus, but if healthcare workers can't get them to care for sick patients, it puts them and all communities at risk."
3 /4: Defendant Ige Emergency Proclamation: Declares Emergency Powers suspending certain statutes
3/9:  CDC alerts American citizens over the age of 60 with pre-existing conditions that they are likely at higher risk of fatality if COVID-19 is contracted.
3/16: Defendant Ige Supplemental Proclamation: Implements Social Distancing and Suspension of Certain State Laws

---

[12] This case intersects science, medicine and associated statistics. In the interest of an efficient presentation, plaintiffs have not footnoted or annotated their numerous scientific, medical and statistical references. Plaintiffs can provide the Court with footnotes and annotations upon request. Plaintiffs have conducted a thorough investigation, and will present the Court with substantial documentation and live expert testimony at trial.

[13] *See* http://www.cdc.gov/nchs/data/misc/hb_me.pdf (last visited February 3, 2021).

3/21: Defendant Ige Supplemental Second Emergency Proclamation: 14 Day Mandatory Quarantine for Interstate Travelers and Criminal Penalties

3/23: Defendant Ige Supplemental Third Emergency Proclamation: Implements Stay Home Orders: Essential Businesses vs. Non-Essential

3/24: CDC and NVSS issue COVID-19 Alert Number 2. Alert releases a "newly-introduced ICD Code" (U07.1) to "accurately capture mortality data for COVID-19 Disease 2019, COVID-19 on death certificates." The rule establishes a unique system for collecting and reporting cause of death information on individuals who die while purportedly infected with COVID-19. Collecting and reporting cause of death information on individuals who died with any other infectious disease continues to be handled under the old rules. The alert states COVID-19 should be reported on the death certificate for all decedents where the disease caused **or is assumed to have caused or contributed to death**. (Emphasis added).

3/26: Dr. Neil Ferguson, Imperial College London, publishes COVID-19 predictive model **incorrectly asserting 2.2 million Americans will die**. Model not peer reviewed. Shared with policy makers prior to publication.

3/30: US Surgeon General Doctor Jerome Adams states that **data does not support healthy people wearing masks in public**.

3/31: Defendant Ige Supplemental Fourth Emergency Proclamation:14 Day Mandatory Quarantine for Intrastate Travelers

4/14: CDC adopts the CSTE COVID-19 Position Paper significantly altering established medical criteria for diagnosis exclusively for COVID-19 allowing for probable diagnoses unconfirmed by lab testing.

4/16/20: Defendant Ige Supplemental Fifth Emergency Proclamation: **Mask Mandates,** Stay at Home Orders

4/25/20: Defendant Ige Supplemental Sixth Emergency Proclamation: Amending and Restating All Prior Proclamations and Executive Orders

5/5/20: Defendant Ige Supplemental Seventh Emergency Proclamation: Related to the COVID-19 Emergency

5/18/20: Defendant Ige Supplemental Eighth Emergency Proclamation: Related to the COVID-19 Emergency

6/10/20: Defendant Ige Supplemental Ninth Emergency Proclamation: Related to the COVID-19 Emergency

7/17/20: Defendant Ige Supplemental Tenth Emergency Proclamation: Related to the COVID-19 Emergency

8/6/20: Defendant Ige Eleventh Emergency Proclamation: Interisland Travel Quarantine Begins

8/20/20: Defendant Ige Twelfth Emergency Proclamation: Related to the COVID-19 Emergency

8/21: WHO publishes "Coronavirus disease, (COVID-19): Children in masks." The guidance states that **"[c]hildren aged five years and under should not be**

**required to wear masks.**" The decision whether children aged 6 to 11 should wear masks should be based on the specific circumstances of each child, taking into account 6 different factors. Further, "[t]he use of masks for children of any age with developmental disorders, disabilities, or other specific health conditions should not be mandatory..."

9/22/20: Defendant Ige Thirteenth Emergency Proclamation: Negative Test Exception from Quarantine for Interstate Travelers Begins

10/13/20: Defendant Ige Fourteenth Emergency Proclamation: Related to the COVID-19 Emergency

11/16/20: Defendant Ige Fifteenth Emergency Proclamation: Health Screening for Travel, Imposes Costs of Quarantine on Traveler

11/23/20: Defendant Ige Sixteenth Emergency Proclamation: Related to the COVID-19 Emergency

11/27: Consortium of 22 independent scientists publishes external peer review of the Corman-Drosten Paper identifying 10 fatal technical and scientific flaws, calling for the paper's retraction and concluding that the Corman-Drosten protocol that is the basis of PCR testing worldwide has led to "worldwide misdiagnosis of infections attributed to SARS-Co-V-2." The peer review concludes that PCR test data from a cycle value of 35 or more is completely unreliable and detects only non-infectious non-viruses. Less than three percent of samples producing positive PCR test results at this level of amplification when cultured produced positive cultures; in other words, **97 percent of positive PRC tests run an amplification cycle of 35 or more or false positives.** PCR test data from a cycle value of 30 or more is a "grey area". A positive result cannot be trusted. (Emphasis added).

12/1: CDC guidance continues to sanction PCR testing at up to 40 cycles of amplification.

12/11: The US Food and Drug Administration, ("FDA") issues the first Emergency Use Authorization, ("EUA") for the Pfizer-BioNTech COVID-19 vaccine allowing its distribution and use in the United States.

12/14: WHO issues an Information Notice warning of false positive COVID-19 tests resulting from PCR tests run at high levels of amplification. The Notice cautions: "Users of RT-PCR reagents should read the IFU carefully to determine if manual adjustment of the PCR positivity threshold is necessary to account for any background noise, which **may lead to a specimen with a high cycle threshold (Ct) value result being interpreted as a positive result**... "[W]hen specimens returned a high Ct value, it means that many cycles were required to detect virus. In some circumstances, **the distinction between background noise and actual presence of the target virus is difficult to ascertain**." (Emphasis added).

12/16/20: Defendant Ige Seventeenth Emergency Proclamation: Quarantine Days Reduced from 14 to 10

12/18: FDA issues its second EUA for the Moderna COVID-19 vaccine allowing its distribution and use in the United States.

**2021**

1/20: WHO issues a further Information Notice regarding the protocol for COVID-19 tests. The Notice is expected to result in large reductions in the numbers of positive cases. The Notice calls for the careful interpretation of weak positive results, reminds clinicians that the cycle threshold, Ct, needed to detect virus is inversely proportional to the patient's viral load and calls for the number of cycles used to detect the presence of the virus to be reported along with the test result.

2/12: Defendant Ige Eighteenth Emergency Proclamation: Vaccine Passport Exception from Quarantine for Travel

2/19: Defendant Kawakami's Seventh Supplementary Proclamation continues defendant Kawakami's Emergency Proclamation dated March 4, 2020 determining that an emergency or disaster contemplated by section 127A-14, Hawai'i Revised Statutes, continues to threaten the County of Kaua'i

2/27: FDA issues its third EUA for the Janssen/Johnson & Johnson COVID-19 vaccine allowing its distribution and use in the United States.

4/9: Defendant Ige Nineteenth Emergency Proclamation: Continues Interisland Quarantine and Vaccine Passport Exception

5/7: Defendant Ige Twentieth Emergency Proclamation: Related to COVID-19 Emergency Quarantine for Travel Between Counties

5/25: Defendant Ige Supplemental Nineteenth Emergency Proclamation: **Amends Mask Mandate to Permit No Mask While Outside**

6/7: Defendant Ige Twenty-First Emergency Proclamation

8/5: Defendant Ige Twenty-Second Emergency Proclamation

10/1: Defendant Ige Twenty-Third Emergency Proclamation

11/29: Defendant Ige Twenty-Fourth Emergency Proclamation

## B. There Is No Emergency - The Threat Is Manageable and Less Than Originally Expected

### (1) Reported Covid-19 Deaths Fall Far Below the Deaths Projected a Year Ago.

33. The trajectory of the governmental response to COVID-19 was tragically

influenced by a seriously flawed model developed by Neil Ferguson of the

Imperial College London, which predicted 2.2 million deaths from COVID-19 in

the United States (there have been 680,688 according to the CDC as of September 23, 2021), and tens of millions of reported deaths worldwide. There have been 3,339,802 according to Johns Hopkins University as of 5/14/21. Niel Ferguson's model was cited by the WHO. Ferguson's model compared COVID-19 to the Spanish flu, which killed approximately 50 million people in 1918. The model further stated that the only way to prevent massive deaths would be for the entire population of the planet to be locked down and for people to remain separated for 18 months until a vaccine was available. On the basis of Ferguson's report, the WHO, which had previously stated that lockdowns were not effective for containing infectious diseases, recommended that the world follow China's example which included mandatory lockdowns and contact tracing.

34. It is not surprising, given his past work, that Ferguson's projections could be so flawed. In 2002, he predicted that 150,000 people would die from Mad Cow Disease, an estimation 55 times higher than the real number of 2,704. A few years later, he predicted that 65,000 people would die of swine flu and only 457 people died (this estimation was 142 times higher than the real number). Ferguson predicted 200 million deaths from bird flu, and only 455 people died (this prediction was 439,560 times higher than the real number).

35. Tom Frieden, the director of the CDC under President Obama estimated in early March of 2021 that one million US deaths attributable to Covid was

plausible. The media jumped on the bandwagon of dire predictions and spread fear throughout the population. These predictions initially influenced public policy to a considerable degree in the United States, including here, at home in Hawai'i, but we now know that they were wrong.

36. COVID-19 has killed 726 people per Hawai'i Dept. of Health Covid -19 Data as of Sept. 22, 2021, representing 0.000515% of the State's population (1,407,006 pop).[14] This figure alone establishes that there is no justification for the Emergency and the Emergency Mandates.

### (2) COVID-19 Does Not Threaten the Entire Population -- Fatalities Are Limited to a Definable Age Demographic

37. *From the very beginning*, it had been clear that COVID-19 affects the elderly disproportionately, subjecting them to the highest risk of infection if exposed, hospitalization, and death. On February 11th, 2020, the WHO reported that most people infected with SARS CoV-2 would experience only mild symptoms and recover without special treatment, but that "[o]lder people... are more likely to develop serious illness." On March 9, 2020, the CDC alerted American citizens over the age of 60 that they are at a higher risk of fatality if COVID-19 is contracted. A March 30, 2020, study published in a respected UK medical journal, the Lancet, showed a dramatic difference in case fatality rates by

---

[14] 2020 Hawaii Population Estimates - Hawaii Dept. of Business, Economics Dev. and Tourism - Census.

age group, estimating a 0.63 percent average rate for all those under 60 years old and a six percent average rate for those over 60 years old. Data from China, Europe, and the WHO released even earlier in 2020, pointed to the same conclusion.

38. In fact, in Hawai'i, 76% of all deaths attributed to COVID-19 have occurred in the 60 and over age group as of September 22, 2021 [15]. 86% of the Hawai'i population is not included in that demographic. [16] At least 91% of Hawai'i residents who are 60 or over and who are included in the Hawai'i COVID-19 case count, have survived it and this number is much higher as it excludes 19,412 cases with unknown outcomes which most likely do not include any deaths.[17]

39. Based on this data, the defendants could have crafted far less burdensome mandates designed specifically to protect this most vulnerable age demographic rather than forcing mandates on the entire population (the majority of which was at almost no risk). Data available in early March 2020, could have been used by state decision-makers to support narrowly-tailored strategies of containment for the population most at risk without causing profound disruptions

---

[15] Summary of COVID-19 Death - DOH Dashboard Based on In State Residents Only
[16] Age of COVID-19 Cases
[17] Outcomes of COVID-19 Deaths - DOH Dashboard

to the entire economy and all of Hawai`i's residents regardless of their risk profile, therefore, the defendants failed to meet the test of strict scrutiny by narrowly tailoring their response to the least restrictive means.

40. The state's approach to its management of its nursing home facilities during this virus is a prime example of the irrationality and lack of protection of the "most vulnerable" population. The spotlight is Yukio Okutsu State Veterans Home where the state failed to place basic safeguards in place such as infection control guidelines, testing staff, not wearing personal protective equipment and being understaffed. Instead of narrowly tailoring their interventions to protect this "vulnerable" population at a state-run facility, the state's officials deployed countermeasures applicable to the entire population, including extreme lockdown policies, massive governmental intrusions into our daily lives, and maximal invasions of our constitutional freedoms. There is no threat of emergency to the general public.

### (3) COVID-19 Kills Fewer People than Other Causes of Death That No Emergency Has Been Declared or Will Be Declared For

41. According to Vital Statistics, Hawai'i experienced the following non-COVID-19 deaths in 2018 except Suicides which is 2017-19, all without any proclamation of a state emergency:

Estimated Deaths by Cause in Hawai'i[18],

| Cause of Death | Number of Deaths | Per 100K HI Pop.[19] |
|---|---|---|
| Cancer | 120.6 | Per 100K of HI Pop. |
| Heart Disease | 122.5 | Per 100K of HI Pop. |
| Suicide | 70.5 | Per 100K of HI Pop. |
| Diabetes including multiple cases | 60.1 | Per 100K of HI Pop. |
| COVID-19[20] | 51.9 | Per 100K of HI Pop. |

42. The federal CDC reports as of September 23, 2021, that nationwide there have been 680,688 COVID-19 deaths, representing 0.002% of the population. Even if we were to assume *arguendo* that Hawai'i's COVID-19 death per

---

[18] Source: Hawaii State Department of Health, Vital Statistics
[19] Hawaii Population is 1,421,771 per DOH COVID-19 Data Dashboard
[20] Hawaii Dept of Health COVID-19 Data Dashboard

population rate will increase to the national level, it remains less than other leading causes of death in the State for which no emergency has been (or will be) declared.

### (4) COVID-19 Has Not Overwhelmed Healthcare Capacity

43. In March and April of 2020, the defendants told us that our constitutional freedoms had to be taken away from us so that we could "flatten the curve" of COVID-19 cases. This was a reference to a federal CDC model that predicted a tremendous surge in the need for hospitalization around the country due to COVID-19, that would overrun our healthcare infrastructure. That model, like so many others that were the basis for public health policy nationally and in the State, was wildly exaggerated. The federal government spent at least $660 million constructing field hospitals to address Covid-19 around the country, but most of them never treated a single patient and were dismantled. Hawai'i data indicates that while the state has, as of September 22, 2021, a total of 684 ventilators with 163 in use (56 COVID and 107 Non-COVID). Only 23.8% of the state's ventilator capacity was used. The data also indicates that while the state has a total of 342 ICU beds, 285 were in use (72 COVID and 213 Non-COVID) representing 83.3% of total capacity. Therefore, healthcare capacity has not been overwhelmed by Covid-19 and this virus has not created a disaster justifying the current governmental action.

### (5) Multiple COVID-19 Vaccines are Now Deployed

44.  The federal Food and Drug Administration has issued Emergency Use Authorizations for COVID-19 vaccines produced by three different manufacturers – Janssen, Moderna and Pfizer-BioNTech[21], and they are circulating in the population. Federal CDC data indicates that since vaccine distribution began in the United States on December 14, 2020, more than 379,472,220 doses have been administered to 63% of the population per CDC COVID data tracker as of September 11, 2021.  As of September 22, 2021, DOH data indicates that 1,979,534 doses have been administered and that 952,755 completed doses representing 78.4 % of the total population 12+ years and older have been fully vaccinated and 1,039,362 initiated doses representing 88.3% of the total population 12+ years and older. Since the emergency use authorization has ended it would seem to appear that there no longer exists an emergency.

**(6) The Population Has Reached or Is Fast Approaching Herd Immunity Demographic**

45. Dr. Marty Makary, a Professor from Johns Hopkins' Bloomberg School of Public Health, has projected that COVID-19 will disappear in the United States

---

[21] On August 23, 2021, the FDA approved the first COVID-19 vaccine. The vaccine has been known as the Pfizer-BioNTech COVID-19 Vaccine, and will now be marketed as Comirnaty, for the prevention of COVID-19 disease in individuals 16 years of age and older. The vaccine also continues to be available under emergency use authorization (EUA), including for individuals 12 through 15 years of age and for the administration of a third dose in certain immunocompromised individuals.

by April 2021 due to herd immunity, which he says is the "inevitable result of viral spread and vaccination." He explains: "Testing has been capturing only from 10% to 25% of infections, depending on when during the pandemic someone got the virus. Applying a time-weighted case capture average of 1 in 6.5 to the cumulative 42,501,643 million confirmed cases (as reported by CDC on September 23, 2021) would mean about 55% of Americans have natural immunity." Another 64.3%[22] of the population, age 12+ has been vaccinated.  If 64.3% of the population has been fully vaccinated and there are 42,501,643 cases, why is Hawai'i still suffering in the legal construct of this Emergency? As of September 2021, and for the most vulnerable Hawai'i residents – those ages 65-74, 98.8 % have been fully vaccinated - those ages 75 +, 93.5% have been fully vaccinated which means that the most vulnerable population in the state has reached herd immunity through vaccination. The adult population (age 18+) in the State has reached herd immunity through vaccination. Emergency authority should not remain in effect when the majority of the population is vaccinated against the virus or, with this logic, we will remain in a permanent state of emergency and governmental power will be unbridled in violation of the principles with which this nation was founded upon.

---

[22] CDC Tracker CDC Covid Data tracker, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total (last visited Oct 27, 2021).

## C. There is No Emergency - the COVID-19 "Death" and "Case" Counts are Inflated

46. The preceding section of this complaint assumes the accuracy of the

COVID-19 "death" and "case" data upon which the Executive defendants have

based their E.P. In this section, plaintiffs challenge the data's accuracy.

### (1) New NVSS Coding Instructions Unique to the Death Certificates of Individuals Testing Positive for COVID-19 Result in the Over-Reporting of Deaths Caused by COVID-19

47. For the past 17 years, all infectious diseases and causes of death have

been categorized based on the federal CDC's Medical Examiners' & Coroners'

Handbook on Death Registration and Fetal Death Reporting and the federal CDC's

Physicians' Handbook on Medical Certification of Death. These documents

instruct coroners and physicians to differentiate between (i) immediate cause of

death, (ii) underlying cause of death, and (iii) any other illness, condition, or injury

that contributed to but did not cause the underlying cause of death. The Coroners'

Handbook states:

> For statistical and research purposes, it is important that the causes of death and, in particular, the underlying cause of death, be reported as specifically and as precisely as possible. Careful reporting results in statistics for both underlying and multiple causes of death (i.e., all conditions mentioned on a death certificate) reflecting the best medical opinion.

48. On March 24, 2020, the National Vital Statistics System ("NVSS")

introduced a new International Classification of Disease ("ICD") code for

Coronavirus Disease 2019 (U07.1) to "accurately capture mortality data for Coronavirus Disease 2019 (COVID-19) on death certificates." **Instead of differentiating between primary and underlying causes of death, the new coding instruction lumps the two together**, and instructs coroners and physicians to report as COVID-19 deaths any death where the disease caused "*or is assumed to have caused or contributed to death*" (emphasis added).

49. This is not an academic concern. The federal CDC's own data regarding co-morbidities shows that "[f]or 6% of [COVID-19] deaths, COVID-19 was the only cause mentioned. For [COVID-19] deaths with conditions or causes other than COVID-19, on average, there were 2.6 additional conditions or causes of death." **Public health officials across the United States have stated that they consider anyone who died with a positive PCR test to have died from COVID-19, and are counting accordingly**. DOH metrics as of September 22, 2021, state there are 34 COVID-19 deaths that have no other underlying causes representing 5% of the Hawai'i population or only 0.000023 of the state's population. The DOH admits that under its death count rules "*[i]t is not necessary that COVID-19 be the primary cause of death*" (emphasis added).

50. Dr. Genevieve Briand of John Hopkins University published a study demonstrating that **the overall death rate in the United States has remained the same**, despite the deaths attributed to COVID-19. Dr. Briand analyzed federal

CDC data for 2018 and 2020 and found that **nationwide deaths from causes other than COVID-19, decreased by the same amount that COVID-19 deaths increased**. There are no excess deaths due to COVID-19.

51. A first of its kind Stanford University study of seroprevalence data published early in the trajectory of COVID-19, on April 14, 2020, concluded that SARS-CoV-2 infections are more widespread than indicated by case counts, but that the COVID-19 mortality rate is much lower than believed. More recently, Minnesota lawmakers conducted an audit of COVID-19 death certificates, and concluded that **the COVID-19 death count had been inflated by approximately 40% in the state**.

### (2) The PCR Test for COVID-19 is Seriously Flawed and Results in False Positive Results at High Cycles

52. Plaintiffs allege that of all forms of testing for infection with the SARS-Cov-2 virus, the laboratory PCR test dominates in Hawai'i.

53. The PCR test works as follows. The test requires a sample of mucus from a person's nose or throat or sputum (and more recently, PCR tests using saliva have been introduced), then uses that sample to search for viral RNA, which is a fragment of genetic material belonging to a virus. RNA is then converted to DNA through a process called reverse transcription, which is then amplified many times to make it detectable, through a process called polymerase

chain reaction, or PCR. The PCR process of amplification involves creating copies of the viral DNA and is done in cycles, and cycles can be repeated until there are as many as one billion copies of the original viral fragment. The number of times a cycle is repeated is called the "Ct value." In most of the United States' lab settings, the cycle is repeated at least 35-40 times before a specimen is declared "negative," or devoid of viral material, although the WHO initially established a standard cycle threshold limit of 45 cycles.

54. Hundreds of companies are currently producing PCR tests for detecting viral RNA claimed to be from SARS-CoV-2. These tests were approved by the FDA under Emergency Use Authorization (EUA) without an established reference method, but rather testing the tests against other EUA approved tests to establish an acceptable degree of performance. This process involved testing specimens from people who the researchers already knew had COVID-19. This results in significant bias. **Without control groups of blinded testing, it is impossible to determine the magnitude of the inaccuracy of a given test**.

55. There are other issues with the PCR tests. One is that the viral RNA detected by the test is likely to remain in a person for up to 3 months after the infectious period has passed. **This means the tests are useless for determining who should be quarantined** as they do not differentiate between active virus vs. inactive or dead virus from a previous infection or exposure that was effectively

controlled by the body's immune system. Another is the risk of cross-contamination, of collected specimens or reagents (chemical components of the test), from improper handling, in the laboratory or when collecting specimens from large numbers of people in crowded settings. Even the tiniest amount of cross-contamination can lead to a false positive result, which means **people who have never been exposed to COVID-19 could be subjected to unwarranted quarantines**. Therefore, with this test used as the deciding factor, it becomes impossible to use the least restrictive means necessary to achieve a compelling governmental interest.

56. Aside from the issue of accuracy, there is the issue of suitability of the PCR test as a diagnostic tool. The inventor of the PCR test, Kary Mullis, Ph.D., who won a Nobel Prize in chemistry for the invention in 1993, developed the test as a tool for use in laboratory research, but said that the test was never designed to diagnose disease. That is because, while COVID-19 PCR tests identify the presence of viral fragments in DNA, the tests do not provide accurate information about the presence of infectious, live virus as opposed to non-infectious (dead) viral fragments. The federal CDC apparently agrees. The July 2020 instruction manual for its 2019-Novel Coronavirus (2019-nCoV) Real Time RT-PCR Diagnostic Panel test includes these statements: "***Detection of viral RNA may not indicate the presence of infectious virus or that 2019-nCoV is the causative agent***

*for clinical symptoms*" (emphasis added); and "This test cannot rule out diseases

caused by other bacterial or viral pathogens."

57. In addition, it appears that PCR test development took place in the

absence of an isolated SARS-CoV-2 virus, the virus alleged to cause COVID-19.

From the final paragraph of the foregoing instruction manual:

> Since no quantified virus isolates of the 2019-nCoV are currently
> available, assays designed for detection of the 2019-nCoV RNA
> were tested with characterized stocks of in vitro transcribed full-
> length RNA (N gene; GenBank accession: MN908947.2) of known
> titer (RNA copies/$\mu$L) spiked into a diluent consisting of a
> suspension of human A549 cells and viral transport medium
> (VTM) to mimic clinical specimen.

58. In January 2020, a group of scientists authored the Corman-Drosten

Paper, in which they claimed to have validated the use of PCR testing for the

SARS-CoV-2 virus. This Paper was relied upon worldwide to promote the use of

PCR testing. And yet it discloses: "We aimed to *develop* and deploy robust

diagnostic methodology for use in public health laboratory settings without having

virus material available." The scientists claimed to have established a methodology

for using the PCR test to identify the SARS-CoV-2 virus using "theoretical

genetic sequences" of a "closely related" virus. How do you test for something if

you have yet to identify what it is?

59. In November 2020, an international consortium of scientists conducted

an external peer review of the Corman-Drosten Paper, identified 10 fatal defects in

the Paper, and called for its retraction. Obviously, the most serious of the flaws was the fact that **it is impossible to develop a valid test without actual viral material**, and the use of viral material referred to as "closely related" is not a proper substitute. "Theoretical genetic sequencing" means bits of genetic material fed into a computer to guess at the remaining sequence. In other words, it is made up. In plain English, it would appear that there were no available pure SARS-CoV-2 isolates to test against, so instead an educated best guess was used. How accurate can a test for a virus causing COVID-19 be, when that virus has not been isolated? Also, as stated elsewhere, it was determined that the test could not distinguish between whole live virus and dead viral fragments. The federal CDC has admitted that "[r]ecovered adults can continue to shed detectable but non-infectious SARS-CoV-2 RNA in upper respiratory specimens for up to 3 months after illness onset." Further, the Corman-Drosten scientists failed to establish a "Ct value" at which a sample is considered positive and negative.

60. There is yet another problem with the use of the PCR test as a diagnostic test. PCR tests have been shown to produce a highly elevated rate of "false positive" results in people who are likely not infectious, especially in asymptomatic (healthy) people. This is a by-product of the PCR process, in which a viral genetic fragment is amplified in cycles. Each amplification cycle is a doubling, so it is exponential. This means that an amplification factor of 40 is 1 x 2

to the 40th power, or more than a trillion times amplification. As explained in a

review of PCR tests, published by the *Society of Critical Care Medicine*:

> Through the use of fluorescent probes and detection steps between
> replication cycles, the test allows quantification of the amount of
> viral RNA (viral load) in a sample. As DNA is replicated
> exponentially during PCR, the fluorescence also increases
> exponentially. The [testing] instrument reports a Ct (cycle threshold),
> which is the number of replication cycles that are required to produce
> a fluorescent signal that exceeds a baseline. Samples that contain a
> large starting amount of viral RNA require fewer cycles to produce a
> detectable fluorescent signal (and therefore have a lower Ct). The Ct
> has a simple negative linear correlation with the logarithm of the
> number of viral copies in the original sample. This relationship
> quantifies the amount of viral RNA in a specimen; however, the
> assays [tests] must then include additional standards containing
> known concentrations of viral RNA.

61. There are three important things to note in this description. One is

reference to a "baseline," a point at which viral RNA presence is deemed

significant, **which is determined by each test manufacturer**, not a standard

established by a centralized public health authority like the FDA. Another is that in

order to quantify the amount of virus in a specimen, the test must compare the

resultant "Ct value" to "some known concentration of RNA." It is not known if the

tests do this but our research has indicated that the test result is simply a binary.

62. The third important point is that "the Ct has a simple negative linear

correlation with the logarithm of the number of viral copies in the original

sample." The number of cycles at which a viral fragment is detected varies with the

viral load, or the amount of virus, that an individual is carrying. So, individuals

who "test positive" at a higher cycle threshold have a lighter viral load, and are therefore not likely to be infectious. Current practice is to report test results as binary results, "positive" or "negative," with no reference to "Ct value," and therefore **with no consideration of how much of a viral load a person may carry or how infectious they may or may not be, grossly inflating the number of people who pose a risk to others.** A less restrictive means would be to require reference to Ct value. Also, without any standardized guidance from the FDA, the number of cycles at which a test result is deemed "positive" or "negative" varies from lab to lab, test to test. **As a result, healthy people who are not infectious are being unnecessarily subjected to self-isolation, quarantine, and/or contract tracing, and their places of employment can be shut down.**

63. In September 2020, the *Journal of Clinical Infectious Diseases* published scientific research supported by a grant from the French government, in which scientists performed 250,566 COVID-19 PCR tests on 179,151 patients and found that 13,161 were positive. They selected 3,790 "positive" samples and attempted to grow a virus in a culture medium. They were only successful in growing a virus in about half of the samples. For those samples, in which the "Ct value" was 25 cycles for a positive test, 70% grew a virus. But when the "Ct value" was 35 cycles, only 3% of the samples grew a virus. This is important since many of the PCR tests granted Emergency Use Authorization by the FDA use a "Ct value" of 35-45 cycles or higher when testing for COVID-19, and at these cycles **we can**

**expect a false-positive rate as high as 97%** based on the French study. The study

concludes that positive test results at Ct values over 30 should not be used to guide

public health decisions. Many other experts agree with this. Even Dr. Fauci is

aware that PCR is useless and unreliable for diagnosing COVID-19 when run at 35

cycles or higher:

> What is now evolving into a bit of a standard is that if you get a cycle
> threshold of 35 or more that the chances of it being replication
> competent are miniscule…We have patients, and it is very frustrating for
> the patients as well as for the physicians…somebody comes in and they
> repeat their PCR and it's like 37 cycle threshold…you can almost never
> culture virus from a 37 threshold cycle. So I think if somebody does
> come in with 37, 38, even 36, you gotta say, you know, it's dead
> nucleotides, period." In other words, it is not a COVID-19 infection.

64. The chart below sets forth the manufacturer's recommended cycle

threshold for 5 commonly used PCR tests all of which are at or above 35 cycles:

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
|---|---|
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) Test | 40 cycles |
| Quest SARS CoV-2rRT-PCR Test | 40 cycles |
| Opti Sars CoV-2 RT-PCR Test | 45 cycles |

| | |
|---|---|
| Wren Labs COVID-19 PCR Test | 38 cycles |
| LabCorp COVID-19 RT-PCR | 35 cycles |
| Xiamen Zeesan SARS-CoV-2 Test Kit (Real Time PCR) | 45 cycles |

The Food and Drug Administration ("FDA") has merely authorized for emergency use, rather than approved, the use of PCR testing for SARS-Co-V-2 as a diagnostic aid in the setting of an acutely ill patient with suspected COVID-19 not in asymptomatic individuals. These tests remain experimental **with no assurance of efficacy**. Test manufacturers use disclaimers like this in their product manuals: "[t]he FDA has not determined that the test is safe or effective for the detection of SARS-Co-V-2."

65. The DOH COVID-19 metrics does not include the "all important" cycle threshold. If we defer to public officials like Dr. Fauci and the DOH is using tests with cycles over 35, then "the chances of it being replication-confident are minuscule." Edward Desmond, the administrator at the state laboratory in Hawai'i, admitted that **the state does not collect cycle threshold values for tests performed in that state**. "CT values depend on the chemistry used, the instrument used, and the nucleic acid extraction method used," he

argued. "CT values also depend on the quality of the specimen collected. So, there are many sources of variability. For this reason, there is limited value to reporting or trying to interpret CT values."[23] Plaintiffs allege that Hawai'i is using tests with cycles that exceed 35 which produces unreliable results rendering the entire testing regime as a fraudulent practice.

66. Detection of SARS-CoV-2 RNA in a clinical specimen using a molecular amplification detection test is classified by DOH as a "confirmed case" also known as confirmatory laboratory evidence.[24]

67. It is also worth noting that these test manufacturers will continue selling tests only as long as the "crisis" continues. Once it ends, sales and profits drop. **They are incentivized to find cases and do not even have to report how they determine a case exists, in that they do not have to report "Ct values."** The state of emergency is being used to benefit pharmaceutical companies at the expense of civil liberties.

68. The WHO has issued two Information Notices cautioning public health officials about the risk of false positive results when PCR tests are run at high cycles. In December 2020, it issued a notice stating:

---

[23] Daniel Payne & Daniel Payne, STATE HEALTH DEPARTMENTS ACROSS COUNTRY FAILING TO COLLECT CRITICAL COVID-19 PANDEMIC DATA JUST THE NEWS (2020), https://justthenews.com/politics-policy/coronavirus/state-health-departments-across-country-are-failing-collect-critical (last visited Oct 27, 2021).

[24] Source: DOH COVID-19 CSTE Case Definition

Users of RT-PCR reagents should read the IFU carefully to determine if manual adjustment of the PCR positivity threshold is necessary to account for any background noise which *may lead to a specimen with a high Ct threshold (Ct) value result being interpreted as a positive result* [W]hen specimens return a high Ct value, it means that many cycles were required to detect virus. In some circumstances, *the distinction between background noise and actual presence of the target virus is difficult to ascertain* (emphasis added).

In January 2021, it issued a further notice counseling the "careful interpretation of weak positive results," reminding clinicians that "[t]he cycle threshold (Ct) needed to detect virus is inversely proportional to the patient's viral load" and calling for the number of cycles used to detect the presence of the virus to be reported along with the test result.

69. If the PCR test error rate were only 5%, that would mean that the number of cases worldwide **is off by millions**. But the error rate has been shown to be much higher, which means the world's population is suffering under unprecedented lockdowns due to a made-up pandemic based on nothing more than "cases".

### (3) Hawaii's "Case" Count is Inflated by Inclusion of "Probable Cases"

70.  DOH includes "probable cases" in its case count. It defines a "probable case" so broadly that it really means any "possible case." According to the DOH, COVID-19 CSTE Case Definition, a "probable case" is *either* (1) meets clinical

criteria[25] AND epidemiologic[26] evidence with no confirmatory laboratory testing
performed for COVID-19 (2) meets presumptive laboratory evidence[27] AND
either clinical criteria OR epidemiologic evidence (3) meets vital records[28] criteria
with no confirmatory laboratory testing performed for COVID-19. (Emphasis
added). DOH states at its COVID Data Page "...both newly reported confirmed
and probable cases will be included in total case counts and not reported on a
separate table."

---

[25] CLINICAL CRITERIA At least two of the following symptoms: fever
(measured or subjective), chills, rigors, myalgia, headache, sore throat, new
olfactory and taste disorder(s) OR at least one of the following symptoms: cough,
shortness of breath, or difficulty breathing OR Severe respiratory illness with at
least one of the following: • Clinical or radiographic evidence of pneumonia, or •
Acute respiratory distress syndrome (ARDS). AND No alternative more likely
diagnosis

[26] EPIDEMIOLOGIC LINKAGE One or more of the following exposures in the 14
days before onset of symptoms: • Close contact** with a confirmed or probable
case of COVID-19 disease; or • Close contact** with a person with: o Clinically
compatible illness AND o Linkage to a confirmed case of COVID-19 disease. •
Travel to or residence in an area with sustained, ongoing community transmission
of SARS-CoV-2. • Member of a risk cohort as defined by public health authorities
during an outbreak. **Close contact is defined as being within 6 feet for at least a
period of 10 minutes to 30 minutes or more depending upon the exposure. In
healthcare settings, this may be defined as exposures of greater than a few minutes
or more. Data are insufficient to precisely define the duration of exposure that
constitutes prolonged exposure and thus a close contact.

[27] Presumptive laboratory evidence: • Detection of specific antigen in a clinical
specimen • Detection of specific antibody in serum, plasma, or whole blood
indicative of a new or recent infection

[28] VITAL RECORDS CRITERIA A death certificate that lists COVID-19 disease
or SARS-CoV-2 as a cause of death or a significant condition contributing to
death.

### (4) The "Case" Count is Subject to Perverse Financial Incentives

71. As previously noted, manufacturers of the PCR test benefit if the "crisis" continues, and the crisis continues if the state uses PCR tests employing cycles above 30 to determine "cases."

72. **There is a $301,000 financial incentive to classify a death as a COVID-19 death.** In Hawai'i, according to Becker's Hospital Review, hospitals are being reimbursed an additional $301,000 per COVID-19 case, and any death from COVID-19 is classified by the DOH as a "confirmed case" without any lab test. COVID coding on a death certificate is evidence of a probable case and can result in an additional 20% hospital reimbursement from Medicare under provisions of the federal CARES legislation. CDC Director Robert Redfield acknowledged this perverse financial incentive in sworn Congressional testimony on COVID-19: "I think you're correct in that we've seen this in other disease processes too, really in the HIV epidemic, somebody may have a heart attack, but also have HIV – the hospital would prefer the classification for HIV because there's greater reimbursement."

73. The number reported as "total cases" is extremely misleading for most people who assume that this figure reflects the actual number of persons who are *currently* "infected" and therefore "infectious", or who, by symptoms, have been diagnosed as having COVID-19. The public has been brainwashed to believe

that a "case" is an infectious person walking among the public, a dangerous

"silent spreader" of a virus. The public is being misled by the fear-inducing,

ever-increasing, cumulative case count that is constantly and verbally projected

at them, believing that these numbers demonstrate a serious state of emergency.

It is no wonder that so many people are living in extreme panic and hysteria over

this disease.

74. In sum, these "case" and "death" counts, based on uniquely relaxed rules

for death certificate reporting, faulty PCR testing, "probable case" counts are

inflated and completely unreliable. They are subject to perverse financial

incentives. They are broadcast to the public and used to justify the Emergency that

has stolen from the people their precious freedoms who are subject to criminal

prosecution, imprisonment and fines if the E.P. is violated. Where is the limit of

judicial deference, in these circumstances?

**D. The Defendants' COVID-19 Mandates Are Ineffectual, and Unsupported by Science or Medicine**

75. Quarantine orders and similar profound restrictions ordinarily require

some degree of analysis indicating that the particular individuals quarantined,

businesses and schools closed, and activities prohibited, pose an immediate and

direct threat of contributing to the spread of an epidemic. The defendants have

performed no such individualized analysis or assessment determining that these

plaintiffs and their businesses and activities constitute a particular threat vector for

COVID-19, thus cannot demonstrate that quarantining, masking or testing them, closing their businesses or schools or prohibiting their activities is narrowly tailored to achieving their public health goals. Assuming *arguendo* they are threat vectors, the defendants cannot demonstrate that the restrictions imposed through the E.P. are necessary in order to achieve their public health goals.

### (1) The Fallacy of Asymptomatic Spread

76. On September 9, 2020, Dr. Fauci stated in an official press conference: "[E]ven if there is some asymptomatic transmission, in all the history of respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always the symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers."

77. The designation of healthy people as a "case" which represents an "infection" is part of the "asymptomatic spread" argument, which the State uses to justify isolating everyone, throwing them out of work, closing businesses, and destroying the learning and social lives of children in the name of public safety. But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real. To the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare."

"From the date we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare." Researchers from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is *almost non-existent*. "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were zero positive COVID-19 tests amongst 1,174 close contacts of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*. Therefore, the current restrictions are unsupported by science as restrictions are being placed in circumstances where transmission is "very rare".

**(2) The Futility of Masking**

78. Defendant Ige's Twenty-Fourth E.P. Exhibit A "Face Coverings" requires all persons, **even those as young as 5 to wear masks** in indoor public settings subject to certain exceptions. This draconian age limit contradicts WHO guidance that "[c]hildren 5 years and younger should not be required to wear masks. This is based on the safety and overall interest of the child and the capacity to appropriately use a mask with minimal assistance. ...the decision to use masks for children aged 6-11 should be based on ...[p]otential impact of wearing mask on learning and psychosocial development, in consultation with teachers, parents/caregivers and/or medical providers." In addition, "any business or

operation shall refuse admission or service to any individual who fails to wear a face covering, unless an exception applies under this section. Businesses or operations may adopt stricter protocols or requirements related to face coverings and face shields. Businesses or operations not enforcing this rule may be subject to enforcement, including fines and mandatory closure." **This rule effectively makes all owners of businesses and operations the police enforcers acting under color of law** with the outrageous economic penalty of fines and mandatory closure for not acting as the COVID-19 police. **This rule also gives these businesses acting under color of law authority to determine whatever mask requirements it arbitrarily and capriciously decides to enact**. This rule applies to both essential and non-essential business and operations.

79. Those who insist that mask-wearing has been proven to be effective in slowing or stopping the spread of COVID-19 and is universally recommended according to the "science" are propagating false and misleading information. The federal CDC has admitted: **"There is no scientific evidence for healthy people wearing masks."** A September 2020 federal CDC study of confirmed COVID-19, symptomatic adults treated in academic outpatient clinics revealed that **people who report wearing masks "always" or "often" are at 18 times the risk of developing COVID-19, compared to those who report wearing them "never" or "rarely."** **Thus defendant Ige's mask mandates are not supported by**

**science and are not only not the least restrictive means to achieve a compelling government interest but are COUNTERPRODUCTIVE to the stated interest.**

80. The results of the first randomized controlled trial evaluating the effectiveness of face masks against SARS-CoV-2 were published in November 2020. Danish scientists and physicians studied 6000 individuals at the University of Copenhagen and concluded that wearing a high quality surgical mask **"did not reduce, at conventional levels of statistical significance, incident SARS-CoV-2 infection."** Among the study subjects who wore masks, 1.8% tested positive for SARS-CoV-2, compared to 2.1% among the control group.

81. A study of tightly controlled U.S. Marine Corps recruits published in the New England Journal of Medicine in November 2020 came to the same conclusion. 2% of a group of 1,848 recruits tested positive for SARS-CoV-2, in spite of mandatory masking at all times, daily cleaning of rooms, sanitizing bathrooms with bleach wipes, maintaining 6 feet of distance, never leaving campus, avoiding items that might lead to surface-based transmission, and eating pre-plated meals. Economist Brian Westbury assembled data from the COVID Tracking Project and YouGov.org showing that daily positive SARS-CoV-2 tests rose and fell precipitously despite mask-wearing being sustained continuously at 80%. Epidemiologists have noted that SARS-CoV-2 "is following the predictable

bell-shaped pattern of epidemics predicted by Farr's law in 1840, regardless of mitigation efforts."

82. The U.S. Surgeon General has stated: "Seriously people - STOP BUYING MASKS! They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!" And on another occasion he said: "Masks are not effective in preventing the general public from catching coronavirus." NIAID Director Dr. Fauci has said: "People should not be walking around wearing masks. Masks do not provide the protection people think they do." He also said: "When you are in the middle of an outbreak, wearing a mask might make people feel a bit better, and it might even block a droplet. But it is not providing the perfect protection that people think it is, and often there are unintended consequences…" The FDA has said: **"Even a properly fitted N95 mask does not prevent illness or death**." The California Department of Health has said: "There is limited evidence to suggest that use of cloth face coverings during a pandemic could help reduce disease transmission."

83. The WHO "acknowledges that we lack evidence that wearing a mask protects healthy persons from SARS-CoV-2." The WHO's "Advice on the Use of Masks in the Context of COVID-19" states that "[a]t present, there is no direct evidence (from studies on COVID-19 and in healthy people in the community) on

the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19. The WHO also stated: "the widespread use of masks by healthy people in the community setting is not yet supported by high quality or direct scientific evidence and there are potential benefits and harms to consider." Dr. Mike Ryan, Executive Director of the WHO's Health Emergencies Program, has stated: "**There is no specific evidence to suggest that the wearing of masks by the mass population has any potential benefit. In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly**." Researchers at Oxford University's Centre for Evidence-Based Medicine have stated: "despite two decades of pandemic preparedness, there is considerable uncertainty as to the value of wearing masks." This is all very consistent with the position published in the New England Journal of Medicine, the premier medical journey in the country: "We know that wearing a mask outside health care facilities offers little, if any, protection from infection."

84. Finally, as previously alleged, scientific studies show that asymptomatic transmission is extremely rare. **Since SARS-CoV-2 particles are 0.06 to 0.125 microns in size, and masks and respirators filter particles 0.3 to 0.8 microns in size, masks cannot possibly work.** Thus mandating masking for the healthy in public spaces is not likely to have any significant impact on overall rates of community spread.

85. At the same time, **face masks cause a range of serious physical and psychological harm**. They have been shown to raise resting blood pressure in both pregnant and non-pregnant women. They have been shown to reduce oxygen intake and increase carbon dioxide intake. The increased carbon dioxide levels caused by mask-wearing can lead to cognitive impairment. Wearing a mask can result in dangerously low blood oxygen levels. The federal Occupational Safety and Health Administration ("OSHA") requires that employees breathe air consisting of at least 19.5% oxygen, and masks have been shown to reduce oxygen content by at least 20%, so that mask-wearers are receiving air with at most 16.2% oxygen.  OSHA states:

> Human beings must breathe oxygen . . . to survive, and begin to suffer adverse health effects when the oxygen level of their breathing air drops below [19.5 percent oxygen]. Below 19.5 percent oxygen . . . , air is considered oxygen-deficient. At concentrations of 16 to 19.5 percent, workers engaged in any form of exertion can rapidly become symptomatic as their tissues fail to obtain the oxygen necessary to function properly . . . Increased breathing rates, accelerated heartbeat, and impaired thinking or coordination occur more quickly in an oxygen-deficient environment. Even a momentary loss of coordination may be devastating to a worker if it occurs while the worker is performing a potentially dangerous activity, such as climbing a ladder. Concentrations of 12 to 16 percent oxygen cause tachypnea (increased breathing rates), tachycardia (accelerated heartbeat), and impaired attention, thinking, and coordination . . . even in people who are resting. At oxygen levels of 10 to 14 percent, faulty judgment, intermittent respiration, and exhaustion can be expected even with minimal exertion.

Masks have been shown to induce headaches in over 80% of wearers.

86. German researchers studied reports made by parents and physicians into an online registry, regarding the effects of masking on 25,930 children who wore a mask on average 270 minutes each day. 60% of reports complained of irritability, 53% of headache, 50% of difficulty concentrating, 44% of reluctance to go to school, 42% of malaise, 38% of impaired learning, 37% of drowsiness or fatigue, 29.7% of shortness of breath, 26.4% of dizziness and 17.9% of being unwilling to move or play. Face masks may have negative psychological impacts, particularly for children. Columbia University Professor of Psychiatry Kathleen Pike has stated:

> Many young children burst into tears or recoil when someone wearing a mask approaches....By putting on masks, we take away information that makes it especially difficult for children to recognize others and read emotional signs, which is unsettling and disconcerting. These issues may be especially true for children with autism spectrum disorder, including Asperger's syndrome, who tend to have particular difficulties reading non-verbal cues.

87. **Masks have a profoundly dehumanizing effect**. Over 60% of interpersonal communication is conveyed via non-verbal behaviors. The mask hides non-verbal communication, distorts the structure of the face, and disguises identity.

88. **Masks increase the risk of contracting an infection**. The U.S. Surgeon General stated: "You can increase your risk of getting COVID-19 by wearing a mask if you are not a health care provider. Folks who don't know

how to wear them properly tend to touch their faces a lot and actually can increase the spread of coronavirus." The United Kingdom's Deputy Chief Medical Officer stated: "For the average member of the public walking down a street, it is not a good idea. In fact, you can actually trap the virus in the mask and start breathing it in."

### (3) The Futility of Lockdowns

89. In October 2020, WHO Special Envoy on COVID-19 Dr. David Nabarro stated: "**We in the World Health Organization do not advocate lockdowns as the primary means of control of this virus**. The only time we believe a lockdown is justified is to buy you time to reorganize, regroup, rebalance your resources, protect your health workers who are exhausted, but by and large, we'd rather not do it."

90. In January 2021, Stanford University scientists published a peer reviewed study in a medical journal concluding that the mandatory stay-at-home orders and business closures imposed in 8 countries including the United States have "**no clear significant beneficial effect**" versus voluntary measures adopted by countries such as Sweden and South Korea. If there is no clear beneficial effect such actions cannot meet the requirement of being NECESSARY to achieve a compelling state interest.

91. In November 2020, French researchers analyzed data collected from 160 countries over the first 8 months of the pandemic, and concluded in a published study that "stringency of the measures settled to fight pandemia, including lockdown, did not appear to be linked with death rate."

92. In July 2020, the peer-reviewed medical journal the Lancet published a study in which researchers collected data from 50 countries with the highest numbers of COVID-19 cases, and concluded that **"government actions such as border closures, full lockdowns, and a high rate of COVID-19 testing were not associated with statistically significant reductions in the number of critical cases or overall mortality**."

93. In June 2020, researchers from Tel Aviv University published a study analyzing cell phone mobility data released by Apple, Inc. that **found no statistical association between lockdown severity and the number of COVID-19 fatalities**. "We would have expected to see fewer COVID-19 fatalities in countries with a tighter lockdown, but the data reveals that this is not the case."

94. In May 2020, Oxford University's Blavatnik School of Government published a study of the lockdown countermeasures deployed by 17 different European governments called "The Results of Europe's Lockdown Experiment Are In." The study concluded that **"there's little correlation between the**

severity of a nation's restrictions and whether it managed to curb excess fatalities."

## E. The Defendants' COVID-19 E.P. Have Wrought More Harm Than COVID-19 Itself Has Caused

95. The real emergency the public confronts is one caused by the E. P.'s themselves, not by COVID-19. The state bombards the public with misleading case and death counts, and terrorizes it with doomsday public health language and scenarios, but it has not similarly reported on data showing the economic and human costs inflicted by these E.P's. There is no "unintended consequences" dashboard. In addition to immediate harm, the E. P. will have trailing long-term costs that cannot be quantified at this time.

### (1) The Economic Crisis Caused by the Emergency Proclamations

96. The E. P.'s have caused extreme unemployment, collapsed consumer spending and widespread permanent business closures in Hawai'i. As a measure of economic damage, the overall unemployment rate is a significant indicator. In December 2019, Hawai`i's not seasonally adjusted civilian labor force unemployment rate was 1.9% but in April and May 2020 it was 21.9%. The rates for each month are as follows respectively for 2020 and 2021: Jun 14.4%, Jul 14.2%, Aug 14.1%, Sep 15.3%, Oct 14.0%, Nov 10.4%, Dec 9.3%, 2021: Jan

9.9%, Feb 8.6%, Mar 8.7%, Apr 8.0%, May 7.4%, Jun 7.8%, Jul 6.9%, Aug 6.6%.[29]

The Honolulu Star Advertiser published in September of 2020 ," Hawai'i had the second--highest rate among states for permanent business closures from March 1 to July 10, at 6.9 permanent closures per 1,000 businesses." Attributing the cause to, "Hawai'i government emergency orders aimed at mitigating COVID-19's spread have restricted what kinds of businesses can operate, how they serve customers and how many customers they can serve."[30]

97. The Hawai'i not seasonally adjusted job count in 2019 for Leisure and Hospitality was 126,800 jobs which represents 19% of the state's non-agricultural wage and salary jobs. The 2020 Leisure and Hospitality not seasonally adjusted job count in 2020 was 77,900 jobs.[31] **This is a devastating 39% job loss in this critical Hawai'i job industry; tourism directly caused by defendants E.P's.**

---

[29] Source: Unemployment rate/labor force, UNEMPLOYMENT RATE/LABOR FORCE, https://dbedt.hawaii.gov/economic/unemploymentrate-laborforce/ (last visited Oct 27, 2021).

[30] Andrew Gomes, HAWAII BUSINESSES CLAIMED BY COVID-19 COULD TOTAL 1,000 ON WAY TO 25,000 STAR ADVERTISER (2020), https://www.staradvertiser.com/2020/09/20/hawaii-news/hawaii-businesses-claimed-by-covid-19-could-total-1000-on-way-to-25000/ (last visited Oct 27, 2021).

[31] Source: JOB COUNT BY INDUSTRY, https://dbedt.hawaii.gov/economic/job-count-by-industry/ (last visited Oct 27, 2021).

Tourism represents nearly a quarter of Hawai`i's economy, according to Sumner La Croix, an economist with the University of Hawai'i Economic Research Organization. A September 2020 Yelp Economic Impact Report revealed that restaurant and retail, among the businesses that serve the tourism sector, have suffered the greatest rate of business closures.

98. Hawaii hospitals are facing an unprecedented "financial tsunami" as the cancelation of elective and non-urgent procedures has forced them to lose as much as $580 million. People are canceling these procedures due to the emergency narrative and hospitals are, in return, even further incentivized to classify deaths as Covid-19 to supplement their loss in income. The E.P. have damaged Hawaii's healthcare infrastructure far more than any threat posed by COVID-19.

### (2) The Human Catastrophe Caused by the E.P.

99. Hawai'i is experiencing unprecedented food insecurity. Hawai`i's food banks are reporting "skyrocketing" demand. **According to the Hawai'i Food Bank the E.P.'s have produced an economic crisis unlike anything since the Great Depression**, and the current crisis is likely to reverse the improvements that have occurred over the past decade as food insecurity in Hawai'i has grown by more than 50 percent — representing the fourth highest percentage increase in the United States. Now, nearly a quarter of a million Hawai'i residents are currently

struggling with hunger. Among them are out-of-work parents, isolated kūpuna and 1 in 4 keiki.[32]

100.   Hawai'i is experiencing unprecedented housing insecurity. In a simulation study published in a UHERO blog, for the second half of 2020, thousands of renters will then likely face unsustainable housing burdens. The study concludes that significant disruption to the rental market after August 1st if nothing is done to support households suffering from COVID-induced job losses. Looking only at housing costs, the COVID Rent Deficit (defined as the amount of rent subsidy that would be required to return all unemployed renters to the rent burden they experienced before the economic shutdown) falls well above $100 million dollars.[33] In an update of this simulation for 2021, the study concludes **at least 10,000 families will be in perilous housing situation in addition to the normal strains of Hawai`i's housing market**.[34]

---

[32] Source: Covid-19 Recovery, HAWAII FOODBANK (2021), https://hawaiifoodbank.org/covid-19/ (last visited Oct 27, 2021).

[33] Laura Thielen June 18 et al., ESTIMATING THE NEED FOR RENTAL ASSISTANCE IN HAWAII · UHERO UHERO (2020), https://uhero.hawaii.edu/estimating-the-need-for-rental-assistance-in-hawaii/ (last visited Oct 27, 2021).

[34] Philip ME Garboden & Isabelle Picciotto, ESTIMATING COVID-19 INDUCED RENTAL HOUSING HARDSHIP IN 2021 · UHERO UHERO (2020), https://uhero.hawaii.edu/estimating-covid-19-induced-rental-housing-hardship-in-2021/ (last visited Oct 27, 2021).

101. Unemployment takes a toll on the ability of individuals and families to sustain themselves, deprives them of dignity, and has been linked in peer reviewed studies to a 20-30% increase in suicides and mental health problems. The negative emotions associated with joblessness and lockdown are known to trigger relapse and increased substance usage in substance abusers.

102.  Suicide and depression rates have increased dramatically – particularly in younger people since Covid-19 restrictions have been put in place. CDC Director Robert Redfield admitted: "But there has been another cost that we've seen, particularly in high schools. **We're seeing, sadly, far greater suicides now than we are deaths from COVID. We're seeing far greater deaths from drug overdose that are above the excess that we had as background than we are seeing deaths from COVID.**" A CDC study reported that depression in adults is four times higher than the previous year at 24.3% of people (compared to 6.5% in 2019), and the rate of suicidal ideation in adults has doubled compared to the previous year. Psychological damage to children includes social isolation, inability to participate in athletics, instilling fear of people not wearing masks, and collapse of family relationships when children are not allowed to be close to grandparents and other relatives. These damages will be seen for at least a generation.

103. **Hawai'i is experiencing unprecedented numbers of drug overdoses**. The CDC - National Center for Health Stats records for its "12 Month-ending Provisional Counts and Percent Change of Drug Overdose Deaths" predicted case, February 2020: 242 and predicted cases, February 2021: 288 (reported cases is 287), a 13.00% increase while the national total increase is 30.4%. [35]

104. Hawai'i residents have experienced unprecedented pressure on their mental and emotional health. Calls to the DOH Hawai'i CARES Line[36] in 2019 was 92,258, calls in 2020 was 138,856 and calls in 2021 through August 2021 is 77,728. This means **there was a 36% increase in calls to the DOH CARES Line from 2019 to 2020** which plaintiffs allege can be attributed to the restrictions placed by the E.P.'s and the related consequences of such.

105. The Hawai'i Department of Human Services warns that when domestic violence survivors are forced to stay in the home or in close proximity to their abuser more frequently, an abuser may take advantage of the

---

[35] Products - vital statistics rapid release - provisional drug overdose data, CENTERS FOR DISEASE CONTROL AND PREVENTION (2021), https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Oct 27, 2021).
35

[36] Hicares dashboard, HICARES DASHBOARD, https://health.hawaii.gov/bhhsurg/hicares-dashboard/ (last visited Oct 27, 2021).

already stressful situation to exert control over their victim.[37] Experts say the numbers are under-reported, since victims have fewer opportunities to report. **The Domestic Violence Action Center's (DVAC) Helpline, which serves Hawai'i, reports a 46% increase in contacts during the COVID-19 crisis, from late March to October 2, 2020**. During the same time period, DVAC's provision of legal information to domestic violence survivors increased by 22% and safety planning services decreased by 38%.[38]  Alcohol plays a role in much domestic violence and consumption has increased during COVID-19 as reported in the International Journal of Environmental Research and Public Health.[39] The New England Journal of Medicine recently discussed the "pandemic within the pandemic" of increased intimate partner violence. **This type of violence has become far more pervasive when victims cannot escape their abusers in a no-travel, lockdown situation**. The National

---

[37] State of Hawai'i, Department of Human Services. Social Services. (March 2020). Important Update Amid the COVID-19 Crisis.

DOMESTIC VIOLENCE RESOURCES, https://humanservices.hawaii.gov/ssd/domestic-violence-resources/ (last visited Oct 27, 2021).

[38] Correspondence from Domestic Violence Action Center. June 26, 2020. https://domesticviolenceactioncenter.org/. Figures represent services to all survivors of domestic violence, including both survivors of intimate partner violence and survivors of child abuse and neglect.
[39] Alcohol consumption during the covid-19, , https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7763183/ (last visited Oct 29, 2021).

Commission on COVID-19 and Justice found an 8.1% increase in domestic violence nationally, after studying crime reports, emergency hotlines and hospital data.

106. **Hawai'i Department of Human Services believe cases of child abuse increased during the COVID-19** despite a decline in the number of cases reported during that time. Experts say the numbers are under-reported, since victims are isolated from third party mandatory reporters. The federal CDC admits that "the social and economic effects of mitigation measures, such as loss of income, increased stress related to parental child care and schooling responsibilities, and increased substance abuse and mental health conditions among adults, increase the risk for child abuse and neglect." The United Kingdom has experienced a 79% increase in reports of child abuse.

107. There is also the negative impact on families and children from school closures. The E.P.'s have created a narrative with which other organizations, such as the DOH, are relying upon and, as such, **school aged children who are least at risk are socially and developmentally suffering**. The Hawai'i DOH recognizes that there are multiple health benefits of children attending school in person, including the fundamental links between education and long-term health outcomes. In-person education is particularly important for younger children and those with special education needs. Social and emotional support resources made available on

school campuses are also critical to the health of children and for some families, food security is provided through school meal programs.[40]

108. Substantial evidence is accumulating that **patients are avoiding medical treatments that could prevent more severe conditions**. This has resulted and will continue to result in excess deaths because people fear getting the treatment they need. The CDC estimates 93,814 non-COVID "excess deaths" in 2020 alone, nationally, including 42,427 from cardiovascular conditions, 10,686 from diabetes, and 3,646 from cancer, and many of these are caused by the cancellation of "non-essential" care in response to COVID-19. The Journal of the American Medical Association reported that the weekly number of newly diagnosed cancer patients has dropped by 46.4% nationally, for 6 major cancers for which early detection is paramount (including breast, colorectal and esophageal), since March 2020. Even a 4-week delay in treatment is associated with increased mortality. Cancer is already a leading cause of death in Hawaii along with heart disease.

109. In January 2021, the U.S. National Bureau of Economic Research estimated that the **unemployment caused by COVID-19 mandates will cause 890,000 excess deaths in the United States over the next 15 years**.

---

[40] Hawaii DOH Guidance for Schools COVID 19 Publication

110. In summary, defendant Governor Ige and defendant Mayor Kawakami, acting under color of state law, caused the plaintiffs and others similarly situated to be deprived of their right to the free exercise of religion, the right of association, violated their right to equal protection, their constitutional right to political speech and peaceable assembly, their right of association, equal protection, false arrest, and imprisonment. The municipality's policy, custom or usage was the moving force behind the deprivation and both defendants are liable in both their personal and official capacities. Their actions fail to withstand the test of strict scrutiny in that their E.P's were not passed to further a "compelling governmental interest," and were not narrowly tailored to achieve that interest. The science provided above demonstrates that there is no ongoing Covid-19 emergency that would create a compelling governmental interest. Further, mask mandates, travel restrictions, gathering restrictions, and stay-at-home orders among other things are not the least restrictive means to achieve the reduction in covid cases and there is evidence to suggest that some of these restrictions are in fact counterproductive. The harms of the E.P.'s do not justify the benefit they produce, if any.

## VI.    COUNTS

### COUNT 1

**DECLARATORY JUDGMENT**
**Cessation of Emergency**

**All plaintiffs alleges against defendants and each of them:**

111. Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

112. In <u>Home Building and Loan Association v. Blaisdell</u>, 290 U.S. 398 (1934), the U.S. Supreme Court stated: "Whether an emergency exists upon which the continued operation of the law depends is always open to judicial inquiry." 290 U.S. at 442, citing <u>Chastleton Corp. v. Sinclair</u>, 264 U.S. 543 (1924).

113. In <u>Sinclair</u>, the Supreme Court stated: "A law depending upon the existence of emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change." 264 U.S. at 547.

114. Both <u>Blaisdell</u> and <u>Sinclair</u> are clear authorities that an emergency and the rules promulgated thereunder must end when the facts of the situation no longer support the continuation of the emergency.

115. They also forbid this court to merely assume the existence of a "public health crisis" based on the pronouncements of the defendants. They are clear authorities that it is the duty of the court of first instance to grapple with this question and conduct an inquiry. "[A] Court is not at liberty to shut its eyes to an obvious mistake when the validity of the law depends upon the truth of what is declared." Id. The Sinclair court instructed lower court's to inquire into the factual predicate underlying a declaration of emergency, where there appears to have been a change of circumstances: "the facts should be gathered and weighed by the court

of first instance and the evidence preserved for consideration by this Court if necessary." 264 U.S. at 549.

116. The defendants' own data, the data produced by the federal CDC and the availability of multiple COVID-19 vaccines demonstrate an undeniable change in circumstances, and that the exigencies underlying the Emergency no longer exist, if they ever did. Plaintiffs have accumulated and will present expert medical and scientific evidence further supporting this contention. If the exigencies no longer exist, then the E.P. must end. Plaintiffs therefore seek a Declaratory Judgment terminating E.P. and the underlying so-called Emergency upon which they depend.

117. The *de minimus* standard of review employed in Jacobson v. Massachusetts, 197 U.S. 11, 31 (1905) has recently been criticized. "The court previously relied on Jacobson v. Massachusetts, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905), and applied a presumption of constitutionality to the state framework. Dkt. 51, at 4-5. This use of *Jacobson* has recently been criticized. See, e.g., Calvary Chapel Dayton Valley v. Sisolak, 140 S. Ct. 2603, 2608, 207 L. Ed. 2d 1129 (2020) decided July 24, 2020. (Alito, J., dissenting from denial of application for injunctive relief) ("[I]t is a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do during the COVID-19 pandemic."); *Cty. of Butler v. Wolf,* 486 F. Supp. 3d 883, 2020 U.S.

Dist. LEXIS 167544, 2020 WL 5510690, at \*6 (W.D. Pa. 2020). Citing from Brach v. Newsom, 2020 U.S. Dist. LEXIS 232008, \*8 n.1, 2020 WL 7222103.

118. Calvary Chapel Dayton Valley was decided after both Carmichael v. Ige, 470 F. Supp. 3d 1133, 2020 U.S. Dist. LEXIS 116860, 2020 WL 3630738 and Bannister v. Ige, 2020 U.S. Dist. LEXIS 129127, 2020 WL 4209225. Other U.S. Court of Appeals outside the 9th Circuit have already rejected the State's earlier pleas to use the *de minimus* standard of review employed in Jacobson v. Massachusetts, 197 U.S. 11, 31 (1905). Savage v. Mills, 478 F.Supp. 3d 16, 26 (D. Me. Aug. 7, 2020) ("Because the facts of that case are distinguishable — a different public health crisis in a different time, threatening different types of injuries to the Plaintiffs — I do not consider Jacobson to be a *de jure* immunity talisman, which is what it will be if judges routinely dismiss cases at the pleading stage based on the immediate evaluation of the merits of governmental action in derogation of constitutional rights. Nor am I convinced that Jacobson will be the Rosetta Stone for evaluating the merits of a challenge to any COVID-19-related government regulation."); Bayley's Campground, Inc. v. Mills, 463 F.Supp. 3d 22, 31 (D. Me. June 5, 2020) ("...it barely authorizes judicial review at all."). Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 635 (2d Cir. 2020) (In *Jacobson*, the Supreme Court upheld a mandatory vaccination law against a substantive due process challenge. Jacobson predated the modern constitutional jurisprudence of tiers of scrutiny, was decided before the First Amendment was incorporated

against the states, and "did not address the free exercise of religion." Indeed, the *Jacobson* Court itself specifically noted that "even if based on the acknowledged police powers of a state," a public-health measure "must always yield in case of conflict with ... any right which [the Constitution] gives or secures."). Nor should the Court allow the Defendants to wall off from judicial scrutiny the underlying exigencies that are the justification for their prolonged Emergency, by shielding them with <u>Jacobson</u> non-review. An appropriate level of intermediate or strict scrutiny must be applied to this question.

119. Plaintiffs therefore seek a Declaratory Judgment that the exigencies underlying the Emergency no longer exist, if they ever did; that the Emergency has ended; and that in the absence of a public health emergency, the defendants lack any reason to continue to violate the U.S. constitutional rights of plaintiffs, thereby nullifying the E. P.

## COUNT 2

### DECLARATORY JUDGMENT
### Constitutional Right to Free Exercise of Religion
### Plaintiffs Bentley, Forman, Shakti alleges against defendants

120. Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

121. The religion clauses in the 1st Amendment of the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST., amend. I.

122. Defendants "stay-at-home" orders infringed on plaintiffs free exercise of religion by inhibiting the practice of their religion and preventing them from being able to freely associate with other church members, the body of Christ, and being able to partake in Holy communion.

123. Also plaintiff Shakti claims that she was forced into quarantine because she refused to submit to a COVID –19 test because the swab tip contains poison and her religious belief is that she is made in the image of God and her body is the temple of God and is commanded by God not to desecrate His temple by poisoning it.

124. Under Lemon v. Kurtzman, 403 U.S. 602 (1971), if a government action does not involve a sect preference it's valid under the Establishment clause if it has a secular purpose, has a primary effect that neither advances nor inhibits religion, and does not foster excessive government entanglement with religion. The E.P. fail to pass the *Lemon* test as one of the primary effects of the stay-at-home order inhibits the practice of religion. Notwithstanding Lemon, plaintiffs urge the court to return to the standards applied in Yoder. See Wisconsin v. Yoder, 406 U.S. 205, 211 (1972).

125.  At a minimum "[t]he 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government... Neither can force nor influence a person to go to or to remain away from church against his will ..." Everson v. Board of Education of the Township of Ewing, 330

U.S. 1, 23 (1947). In the instant case the E.P. locked plaintiffs away from church against their will.

126. This injury in was directly caused by the E.P. and, due to the likelihood of the harm being repeated, is redressable by declaratory judgement and to enjoin any further "stay-at-home" orders. Plaintiffs therefore also seek a Declaratory Judgment that the defendants have violated their First Amendment rights to free exercise of religion and to enjoin "stay-at-home" orders and forced quarantines of healthy people.

## COUNT 3

### DECLARATORY JUDGMENT
### Constitutional Right to Political Speech and Peaceable Assembly
### Plaintiffs For Our Rights, Inc., Levana Lomma against defendant

127. Plaintiffs adopt all of the preceding paragraphs and the claims under Count 5 - Right to Work, Liberty Interest to Engage in Business Activity and incorporate them by reference, as if fully set forth herein.

128. The 1st Amendment to the U.S. Constitution states: "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people to peaceably assemble, and to petition the government for a redress of grievances.: U.S. CONST., amend. I.

129. "The right of free and peaceable assembly for lawful purpose and in a manner without governmental interference or hindrance is a fundamental right, of

the very essence of democracy, and is guaranteed under the First Amendment."
C.J.S., Constitutional Law section.

130. The travel restrictions and "stay-at-home" orders effectively impeded
on Plaintiffs' rights to peaceably assemble and petition the government as they
were not permitted to leave their house or island to engage in political protests
against E.P. Also after the "stay-at-home" orders were lifted and plaintiffs held
political rallies and protest against E.P., the mask mandate prevented plaintiffs
from exercising political speech subject to criminal prosecution for not wearing a
mask outside.

131. Plaintiffs therefore also seek a Declaratory Judgment that the
Defendants have violated their First Amendment rights to peaceable assembly and
to petition the government, to engage in political speech and related freedom of
association.

## COUNT 4

### DECLARATORY JUDGMENT
### False Arrest and Imprisonment
### Plaintiffs against defendants

132. Plaintiffs adopt all of the preceding paragraphs and incorporate them by
reference, as if fully set forth herein.

133. The "stay-at-home" order violated Plaintiffs First and Fourth
Amendment rights and rights to Due Process under the 14th Amendment as this

order is an unreasonable seizure of the person - a false arrest, detention, and imprisonment for an indefinite period of time.

134. Those plaintiffs who were subject to mandatory quarantine were not detained in a reasonable manner and were detained for an unreasonable amount of time. The failure to obtain a negative test from a "trusted partner" does not suffice for probable cause as the tests for Covid are inaccurate and untrustworthy. Additionally, requiring people to obtain a negative test prior to travel does not suffice for probable cause as a less restrictive means would be to test upon arrival if individuals were displaying symptoms and if this were a virus that justified a legitimate governmental interest to assert such power.

135. There is no scientific rationale for requiring the isolation of the individuals and such restrictions overlook the appalling effect of isolation and confinement on a person's physical and psychological health as well as the consequential economic effect on the population at large.

136. Therefore, the E.P.'s constituted an unreasonable seizure (false arrest, detention, and imprisonment) entitling plaintiffs to Declaratory Judgment and to enjoin all "stay-at-home" orders and mandatory quarantines of healthy people.

## COUNT 5

### DECLARATORY JUDGEMENT
### Substantive Due Process-the Right to Interstate Travel and Intrastate Travel

137. Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein

138. The courts have long held that strict scrutiny applies to a violation of substantive due process for fundamental rights. In <u>Planned Parenthood v. Casey,</u> 505 U.S. 833, the U.S. Supreme Court stated:

> Roe, however, may be seen not only as an exemplar of Griswold liberty, but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. If so, our cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims. <u>Cruzan v. Director, Mo. Dept. of Health</u>, 497 U.S. 261, 278 (1990); *cf.*, *e. g.*, <u>Riggins v. Nevada</u>, 504 U.S. 127, 135 (1992); <u>Washington v. Harper</u>, 494 U.S. 210 (1990); see also, *e. g.*, <u>Rochin v. California</u>, 342 U.S. 165 (1952); <u>Jacobson v. Massachusetts</u>, 197 U.S. 11, 2-30 (1905).

139. To reiterate; **"a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims**." (emphasis added).

140. If a state's interest in the protection of life falls so short of being able to override individual liberty interests that it may not be used to prevent the killing of an unborn child, how then can the State argue that it may forgo those interests in an attempt to force ineffective and unproven methods of preventing and/or treating COVID-19, *a disease that has a 99.875% overall recovery rate*? It cannot.

## <u>Right to Personal Autonomy and Bodily Integrity</u>
**Plaintiffs against all defendants**

141. The Supreme Court has stated that the protected liberty claims inherent in personal autonomy and bodily integrity include both the right *to be free from* unwanted medical intervention, and the right *to obtain* medical intervention:

> As the joint opinion acknowledges, *ante*, 505 U.S. at 857, this Court has recognized the vital liberty interest of persons in refusing unwanted medical treatment. Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261 (1990). Just as the Due Process Clause protects the deeply personal decision of the individual to *refuse* medical treatment, it also must protect the deeply personal decision *to obtain* medical treatment, including a woman's decision to terminate a pregnancy. (Id. at 927). (emphasis added).

142. The burden here is on the government to show the E.P.'s were necessary for a compelling governmental interest. The E.P. have forced all plaintiffs to wear face masks against their will, and subject them to criminal prosecution. Face masks are a medical device. The FDA states: "The FDA regulates face masks, including cloth face coverings and surgical masks as medical devices when they are marketed for medical purposes. Medical purposes include uses related to COVID-19, such as face masks to help stop the spread of disease..." Face masks cause psychological harm to children. They reduce blood oxygen levels to dangerous low levels, and can cause tooth decay. There is no scientifically reliable evidence that they are effective in stopping the transmission of SARS-CoV-2. The constant elastic pressure can cause jaw problems over time, a condition that some within the medical community refer to as "mask mouth." COVID-19 testing kits are also an emergency device and the nasal swabs are tipped with a known cancer causing poison, ethylene oxide.

143. As a direct and proximate result of the face-mask and COVID-19 testing mandates, plaintiff's right to privacy, personal autonomy and bodily integrity are violated in that plaintiffs have a right to refuse medical treatment, i.e., right to refuse to wear a mask and be tested and plaintiffs' also have a right to not be denied medical treatment for not wearing a mask too. Plaintiffs have been denied medical treatment from some heath care providers for not wearing their mask. The mask mandate charges business owners (including health care providers) to enforce the mask mandate and failure to enforce the mandate subjects such owners to fines and mandatory closure. There is no explicit exemptions for a health care provider.

144. Plaintiffs therefore also seek a Declaratory Judgment that the defendants have violated their due process rights to personal autonomy and bodily integrity and enjoin mask mandate and COVID-19 testing where testing is mandated.

### Right to Work, Liberty Interest to Engage in Business Activity
**Plaintiffs Alvarez, Bentley, Lomma, against defendants**

145. The 14th Amendment guarantees a citizen's right to work for a living and support herself by pursuing a chosen occupation. Board of Regents v. Roth, 408 U.S. 564, 572 (1972); Truax v. Raich, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of

the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14th] Amendment to secure.").

146. Without the right to work in a profession of their own choosing, rather than being directed into a profession by the State, or directed not to work and placed on subsidies by the State, we are slaves. The E. P. have deprived plaintiffs and similarly situated persons from engaging in their chosen profession as full or part time and from doing work that they find most meaningful. The "stay home" orders violate this right to work and engage in business activity and plaintiffs equate this mandate with a state-wide confinement regardless whether one is infected with COVID-19. Plaintiff Alvarez's occupation is "painter" which is classified as a non-essential business and the "stay home" orders barred him from his occupation causing him to lose money. Plaintiff Levana Lomma operates a non-profit civil rights org, also classified as a non-essential business in Hawai'i, which requires her to travel between the island to educate, fundraise and engage in protected political core speech contesting the legality of the E.P. and these "stay-at-home" orders prevented her from engaging in protected political speech, traveling and thwarting the purpose of the non-profit, a 501(c)3. [Third Supp. E.P. (March 2020)][41]. "Political speech is core First Amendment speech, critical to the functioning of our democratic system," so it " 'rest[s] on the highest rung of the

---

[41] Plaintiff here cites the Emergency Proclamation as an example for simplicity but alleges that other E.P. may apply.

hierarchy of First Amendment values.'" Tandon v. Newsom, 517 F. Supp. 3d 922, 961 (N.D. Cal. 2021), appeal dismissed, No. 21-15228, 2021 WL 3507736 (9th Cir. July 7, 2021) (quoting Carey v. Brown, 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)).

147.   Also, E.P. travel rules implicate plaintiff Lomma's first amendment right to engage in political speech. Past E.P. required 14 day mandatory quarantine for any person traveling interisland [Fourth Supp. E.P. (March 2020)].  The mandatory quarantine is a "prior restraint" on speech as are the "stay-at-home" orders. Plaintiff Lomma alleges that the E.P. is a prior restraint on her political speech since it requires her to be in quarantine even though she is healthy. This prior restraint prevents plaintiff Lomma from delivering the content of her speech for at least 14 days. Any argument that the E.P. is a reasonable content-neutral restrictions fails as prior restraints prohibit the delivery of the speech's content and in any event where the content neutral restriction has a blanket prohibition of speech for at least 14 days is unreasonable. See Schneider v. State of New Jersey 308 U.S. 147 (1939) law prohibiting all demonstrations in public parks or all leafleting on public streets would violate the First Amendment. Plaintiff Madhava Shakti occupation is "artist" and it requires her to sell her art which is sold in various galleries throughout the Hawaiian Islands and requires her to travel interisland to sell her art. Plaintiff Shakti alleges her right to work and liberty interest to engage in business activity was violated by the E.P. because both the

"stay-at-home" orders and 14 day mandatory quarantine for interisland travel

prevented her from traveling interisland to sell her art which is classified under the

E.P. as a non-essential business.

148. In holding that Pennsylvania's closure of all "non-life-sustaining"

businesses "was so arbitrary as to violate the business plaintiffs' substantive due

process rights guaranteed by the Fourteenth Amendment," the Butler court stated:

> The Court recognizes that Defendants were facing a pressing situation to
> formulate a plan to address the nascent COVID-19 pandemic when they took
> the unprecedented step of *sua sponte* determining which businesses were
> "life-sustaining" and which were "non-life-sustaining." But in making that
> choice, they were not merely coming up with a draft of some theoretical
> white paper, but rather, determining who could work and who could not,
> who would earn a paycheck and who would be unemployed - and for some -
> which businesses would live, and which would die. This was truly
> unprecedented. An economy is not a machine that can be shut down and
> restarted at will by government. It is an organic system made up of free
> people each pursuing their dreams. The ability to support oneself is essential
> to free people in a free economy. Id. at 91-92.

### Right to Inter-Travel
**Plaintiffs Bentley, Heideman, Mouer-Tozier, Schulkind, Ridgeway
against defendant Ige**

149. The U.S. Supreme Court has held that the "'constitutional right to travel

from one State to another' is firmly embedded in our jurisprudence." Saenz v.

Rose, 526 U.S. 489, 498 (1999) (quoting United States v. Guest, 383 U.S. 745, 757

(1966)). This right is "virtually unconditional." Id. (quoting Shapiro v. Thompson,

394 U.S. 618, 643 (1969)).

150. Plaintiffs allege that the E. P. *do* burden and impinge the fundamental constitutional right to travel. See Bayley's Campground, Inc. v. Mills, 985 F.3d 153, 159 (1st Cir. 2021) ("We may assume, however, that the District Court was correct to rule both that the requirement does burden the federal constitutional right to interstate travel and that the requirement is subject to strict scrutiny in consequence") and that strict scrutiny is the applicable standard instead of the highly deferential Jacobson standard. Jacobson v. Massachusetts, 197 U.S. 11 (1905).

### Freedom of Movement – Plaintiffs against defendants

151. Separate and apart from the right of travel, there is a fundamental right to move about freely in the public. City of Chicago v. Morales, 527 U.S. 41, 53-54 (1999) striking down an anti-loitering ordinance aimed at combating street gangs and observing that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment.") Papachristou . Jacksonville, 405 U.S. 156, 164-65 (1972) (citing a Walt Whitman poem in extolling the fundamental right to loiter, wander, walk or saunter about the community); Bykofsky v. Middleton, 429 U.S. 964, (1975) (Marshall, J., dissenting) ("The freedom to leave one's house and move about at will is of the very essence of a scheme of ordered liberty, ... and hence is protected against state intrusions by the Due Process clause of the Fourteenth Amendment.") (internal citation and quotation marks omitted)); Waters v. Barry, 711 F. Supp. 1125, 1134

(D.D.C. 1989) (referencing Papachristou and stating "[t]he right to walk the streets, or to meet publicly with ones friends for a noble purpose or for no purpose at all- and to do so whenever one pleases-is an integral component of life, in a free and ordered society."); *see also* United States v. Wheeler, 254 U.S. 281, 293 (1920) ("In all the [s]tates from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective [s]tates, to move at will from place to place therein, and to have free ingress thereto and egress therefrom...."). Nunez by Nunez v. City of San Diego, 114 F.3d 935, 949 (1997) (" The City's failure to provide adequate exceptions not only excessively burdens minors' right to free movement, but it also excessively burdens their right to free speech...").

152.   The "stay home" orders violated plaintiff's fundamental right to freedom of movement. The mask mandate inhibits the movement of the human jaws and tongue movement which implicates both freedom of movement and freedom of expression.

153. Plaintiffs were forced to "stay home" which caused them economic harm since they could not engage in their chosen occupation and earn money and also were unable to express themselves and engage in core political speech whether outdoors or indoors because of the inhibition of movement caused by the wearing a mask.

**Right to Intrastate Travel**
**Plaintiffs Lomma and Shakti against defendants**

154.  Plaintiffs allege that there they have a fundamental right to intrastate travel. The U.S. Supreme Court has declined to decide the issue. Memorial Hosp. v. Maricopa County, 415 U.S. 250, 255–56 (1974). There is a spilt among the circuit courts and our research does not disclose any reported case on this issue in the 9th Circuit.

155. Hawai'i is a unique state as it is an island state and our ohana is spread among the state's islands. Generally, unlike the other states where one may travel unhindered within a state, most inter-island travel; i.e., intrastate travel transportation is usually by plane. The E.P. for a duration of an indefinite time prevented inter-island travel caused by the "stay-at-home" orders. Also throughout the E.P. there were times where there were certain inter-island travel barriers; 14/10 day mandatory quarantine between all islands; 14/10 day mandatory quarantine for travel to and from Maui, Kalawao, and Kauai county *only;* 14/10 day mandatory quarantine for travel to and from Maui, Kalawao, Kauai and Hawaii county *only;* island/counties *may* enact negative COVID-19 tests as an exception to mandatory quarantine, Kauai at times during the E.P. did not enact this exception requiring inter-island travel to undergo a mandatory quarantine; validation of a vaccine regime approved by DOH.

156. Plaintiffs allege that such travel barriers to inter-island travel, i.e., intrastate travel violate the due process clause in the Fourteenth Amendment and are also discriminatory under the Equal Protection clause in that Hawai'i residents are being treated differently than similarly situated Hawai'i residents depending what island/county the resident is traveling to or from. The E.P. also creates a class of those intrastate travelers who can validate they have undergone a vaccine regime approved by DOH and another class of travelers who cannot validate they have undergone a vaccine regime and this class includes travelers who cannot undergo a vaccine regime because of medical condition/disability regardless whether the traveler is symptomatic and asymptomatic for COVID-19.

## COUNT 7

### DAMAGES
### (42 U.S.C. § 1983)

157. Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

158. Defendants, under color of the Emergency Proclamations and emergency orders, rules and regulations, have injured plaintiffs by depriving them of clearly established constitutional rights, privileges and immunities of which a reasonable person would have known, in all of the ways alleged in this Complaint.

159. Defendants, under color of the Emergency Proclamations and emergency orders, rules and regulations, have physically, mentally, emotionally and financially injured plaintiffs in the process of depriving them of their clearly

established constitutional rights, privileges and immunities of which a reasonable person would have known, in all of the ways alleged in this Complaint.

160.  Attorney Fees and Costs under 42 U.S.C. Section 1988

## VII. PRAYER FOR RELIEF

WHEREFORE, and for the foregoing reasons, plaintiffs request that this court:

(A) Declare that the exigencies underlying Governor Ige's Emergency Proclamation no longer exist, if they ever did; and in the absence of a public health emergency, the defendants lack any reason to continue to infringe on the rights of the citizens of the State of Hawai'i, thereby nullifying the Emergency Proclamations and emergency orders, rules and regulations;

(B) Declare that the Emergency Proclamations and emergency orders, rules and regulations, violate the constitutional right to freedom of religion of plaintiffs Greg Bentley, Steven Forman, Madhava Shakti and also for violation of their rights to equal protection of the laws;

(C) Declare that the Emergency Proclamations and emergency orders, rules and regulations, violate the constitutional right to all plaintiffs to personal autonomy and bodily integrity, lawful occupation, freedom of movement, right to travel,

(D) Enjoin the enforcement of the unconstitutional aspects of the challenged Emergency Proclamations and emergency orders, rules and regulations;

(E) Enjoin the use of PCR test results as the basis for determining public health responses and restrictions unless and until it is proven by the defendants that this test is reliable and accurate at the cycle thresholds being used in Hawai'i;

(F) Order that defendants are to provide plaintiffs with due process and equal protection of the laws and medical privacy and autonomy to make their own

health care decisions when they exhibit no signs of sickness as healthy people cannot be subjected to unnecessary medical tests or quarantine.

(G) Award plaintiffs such other and additional relief as the court deems fit.

## VIII. Jury Demand

Plaintiffs request a jury trial on all issues so triable, including without limitation the quantum of damages.

Dated: December 9, 2021

Respectfully submitted,

/s/Sierra Hägg
Sierra Hägg Esq.
(HI Bar #11419)
21 Waianuenue Ave, Ste # 3
Hilo, Hawaii 96720
Tel. 808-969-3600
*Attorneys for Plaintiffs*